**Appeal No. _____**

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAN FARR PRODUCTIONS, DANIEL FARR,
and BRYAN BRANDENBURG, *Defendants–Petitioners,*

v.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF CALIFORNIA, *Respondent,*

SAN DIEGO COMIC CONVENTION, *Plaintiff–Real Party in Interest.*

From the United States District Court for the Southern District of California
Case No. 3:14-cv-01865

## PETITION FOR WRIT OF MANDAMUS

MICHAEL I. KATZ
*mkatz@mabr.com*
L. REX SEARS
*rsears@mabr.com*
   MASCHOFF BRENNAN PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone: (435) 252-1360

*Attorneys for Defendants–Petitioners*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 21-3, petitioner Dan Farr Productions, a Utah limited liability company, discloses that it has no parent company and that no publicly held company owns 10% or more of Dan Farr Productions.

DATED: September 27, 2017    /s/ L. Rex Sears

MICHAEL I. KATZ
*mkatz@mabr.com*
L. REX SEARS
*rsears@mabr.com*
MASCHOFF BRENNAN PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone: (435) 252-1360
*Attorneys for Defendants–Petitioners*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

I.     INTRODUCTION ..................................................................................... 1

II.    WRIT RELIEF AND STANDARD OF REVIEW ..................................... 4

III.   BACKGROUND ........................................................................................ 7

     A.   Statement of the Case ........................................................................ 7

     B.   The Suppression Orders .................................................................... 8

          1.   General Scope of the Orders ....................................................... 9

          2.   Judicial Records and Other Public Documents ..................... 10

          3.   Mandatory Disclaimer ............................................................. 11

          4.   Attorney Fees .............................................................................. 14

     C.   Bases for the Suppression Orders .................................................... 14

          1.   Second Suppression Order ......................................................... 14

          2.   Third Suppression Order ........................................................... 16

IV.   ISSUES PRESENTED AND RELIEF SOUGHT ..................................... 18

V.    ARGUMENT .......................................................................................... 19

     A.   The Second Suppression Order Should Be Vacated (1) for
          Vagueness, (2) Because No Serious and Imminent Threat Was
          Shown, and (3) as Not Narrowly Drawn ....................................... 19

          1.   The Second Suppression Order Is Internally Inconsistent,
              Hence Unconstitutionally Vague ............................................. 19

2.    No Serious and Imminent Threat Justified the Second Suppression Order ......................................................20

    a.    The Supposedly "Extensive" Reach of Petitioners' "Online Networks" Is Belied by San Diego's Populous and Metropolitan Character...............................................23

        i.    The Venue Is Large, Populous, and Metropolitan...................................................24

        ii.    The Metrics Relied on by the District Court Are Not Relevant ........................................25

        iii.    The District Court Disregarded Alternatives and Misapprehended the Relevant Inquiry ...................28

    b.    The Evidence the District Court Cited Does Not Show that the Venire Is Being Influenced .......................29

    c.    The Nearness of Trial Cannot, without More, Justify a Prior Restraint ..................................................31

3.    The Second Suppression Order Is Not Narrowly Drawn.....32

B.    The Third Suppression Order Should Be Vacated.........................33

    1.    Allowing the Legacy Litigation Page to "Continue to Persist" Did Not Violate the Second Suppression Order .....................................................33

    2.    The Third Suppression Order Amounts to a Criminal Contempt Sanction Imposed Without Due Process..............35

C.  Even if Either Suppression Order Were Sustained, Petitioners Should Not Be (1) Forbidden to Republish or Quote from Public Documents (Including Judicial Records) or (2) Required to Post a Disclaimer ......................................................38

    1.  Republication of Already Public Documents Should Not Be Proscribed.........................................................39

    2.  The Counterproductive Disclaimer Mandate Should Be Undone..........................................................................40

VI.  CONCLUSION...........................................................................42

CERTIFICATE OF COMPLIANCE ...................................................43

STATEMENT OF RELATED CASES ..................................................44

CERTIFICATE OF SERVICE ..............................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ...................................................................1, 41

*Bauman v. United States District Court*,
557 F.2d 650 (9th Cir.1977) ..............................................................................4, 5

*Bose Corp. v. Consumers Union*,
466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984) ....................................6

*Bridges v. California*,
314 U.S. 252, 62 S. Ct. 190, 86 L. Ed. 192 (1941).....................................31, 32

*CBS v. United States District Court*,
729 F.2d 1174 (9th Cir. 1983)...........................................................4, 5, 24, 42

*Chase v. Robson*,
435 F.2d 1059 (7th Cir. 1970) ..........................................................................15

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975) ..........................1, 39, 40

*Craig v. Harney*,
331 U.S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947)................................*passim*

*Daily Herald Co. v. Munro*,
838 F.2d 380 (9th Cir. 1988)...............................................................................6

*F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*,
244 F.3d 1128 (9th Cir. 2001)...........................................................................36

*Gentile v. State Bar of Nevada*,
501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) .............................22

*Gilbert v. National Enquirer, Inc.*,
51 Cal. Rptr. 2d 91 (Ct. App. 1996) ..................................................................39

*Hunt v. NBC,*
    872 F.2d 289 (9th Cir. 1989) ................................................................*passim*

*Levine v. United States District Court,*
    764 F.2d 590 (9th Cir. 1985) ................................................................*passim*

*Nebraska Press Association v. Stuart,*
    427 U.S. 539, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) ............................*passim*

*Newton v. NBC,*
    930 F.2d 662 (9th Cir. 1990) .............................................................................6

*Organization for a Better Austin v. Keefe,*
    402 U.S. 415, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971) ......................................20

*People v. Harris,*
    623 P.2d 240 (Cal. 1981) ...............................................................................25

*Rodríguez-Vázquez v. Solivan,*
    844 F.3d 351 (1st Cir. 2016) ..........................................................................34

*Sacramento Bee v. United States District Court,*
    656 F.2d 477 (9th Cir. 1981) .......................................................................4, 5

*Skilling v. United States,*
    561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) ........................24, 29

*Southeast Promotions, Ltd. v. Conrad,*
    420 U.S. 546, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975) ...................................21

*Whittaker Corp. v. Execuair Corp.,*
    953 F.2d 510 (9th Cir. 1992) ...........................................................36, 37, 38

**Rules**

Federal Rule of Criminal Procedure 42 ...........................................................38

**Other Authorities**

Restatement (Second) of Torts, § 587 ...............................................................39

## I.    INTRODUCTION

Petitioners Dan Farr Productions ("DFP"), Daniel Farr, and Bryan Brandenburg, defendants below, produce Salt Lake Comic Con ("SLCC"), in Utah. They seek a writ directing the district court to vacate a series of increasingly repressive prior restraint orders that:

(1)    indiscriminately prohibit "<u>all</u> references to the pending litigation,"[1] without any basis for finding "a serious and imminent threat to the administration of justice";[2]

(2)    deny them their right to truthfully report "official court records open to public inspection";[3] and

(3)    violate their right "to remain silent"[4] by forcing them to post a "disclaimer" that serves no purpose other than shaming them.

Plaintiff below is San Diego Comic Convention ("SDCC"), which produces its own comic con that it claims has become "the focal point for

---

[1] *See* ECF Doc. 264 at 2:10.

[2] *See Craig v. Harney*, 331 U.S. 367, 373, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947).

[3] *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975).

[4] *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n. 4 (10th Cir. 2004).

the world of comics conventions." SDCC was not the first to produce a comic con; and for its first quarter century, SDCC was content to distinguish its event from others by calling it the "*San Diego* Comic-Con." But in 1995 SDCC began, in ineffective fits and starts, trying to corner the market on terminology by claiming exclusive rights in the standalone, generic term "comic con" (or "comic-con"). In 2014, SDCC brought its first suit for infringement of its alleged rights in the standalone "comic con," against petitioners.

Comic fans outside San Diego have been skeptical of SDCC's effort to anoint itself the one and only comic con. The district court's recent order denying summary judgment observes:

> "[C]omic cons" are held in nearly every state of the United States including New York Comic Con, Amazing Arizona Comic Con, Emerald City Comic Con, and Tampa Bay Comic Con. … [O]ver 100 competitors us[e] the unhyphenated form of Plaintiff's trademark …[5]

Thus in more than a hundred other places, fans and organizers are hoping petitioners vindicate *everyone's* right to continue participating in eponymous cons nearer their homes by obtaining a judgment that "comic

---

[5] *See* ECF Doc. 253 at 19:20-23.

con" is generic. Petitioners have appreciated the moral support; and they had hoped to translate it into material support—including funding, strategic discussions, and live witness appearances—for the expensive trial that appears inevitable now that summary judgment has been denied. But the district court's suppression[6] orders will prevent them from doing so.

The natural and intended targets and audience of petitioners' speech are people *outside* the venue, where the litigation's effects will be felt most: win or lose, SDCC will still have the right to call its event a comic con; at issue is the right of people *outside* the venue to call their local comic con a comic con. No showing was made that the jury pool *within* the venue has been or would be affected; indeed, the most recent suppression order is not even *nominally* premised on any supposed threat to the venire but instead was imposed as a sanction for petitioners' failure to comply with a provision that the district court was asked (by SDCC) to include in an earlier suppression order but did not. Individually and collectively, the

---

[6] Although the more familiar terminology for a prior restraint is "gag order," the district court is "not fond of the gag order term" and prefers "suppression order." *See* transcript of "Motion/Status Hearing" ("July 14 Transcript," excerpted as Exhibit F hereto) at 6:3-5. Petitioners defer to the district court's preference.

suppression orders are a constitutional affront that should not be allowed to stand.

## II.   WRIT RELIEF AND STANDARD OF REVIEW

This Court assesses the "availability of writ relief" by reference to the "*Bauman* factors"[7]:

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. … (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.[8]

"[R]arely if ever will a case arise where all the guidelines point in the same direction or even where each guideline is relevant or applicable."[9] Instead,

---

[7] *See CBS v. United States District Court*, 729 F.2d 1174, 1177 (9th Cir. 1983).

[8] *Bauman v. United States District Court*, 557 F.2d 650, 654-55 (9th Cir.1977) (citations omitted).

[9] *Bauman*, 557 F.2d at 655; *see also Sacramento Bee v. United States District Court*, 656 F.2d 477, 480-81 (9th Cir. 1981) ("Writs of mandate are …guided by these factors only in extraordinary circumstances, guided by these factors, all of which need not be present").

"[t]he considerations are cumulative and proper disposition will often require a balancing of conflicting indicators."[10]

In suppression order cases, "[t]he first *Bauman* factor … is satisfied because … direct appeal is unavailable" and "[t]he second *Bauman* factor … is also satisfied" because "the damage resulting from a prior restraint—even a prior restraint of the shortest duration—is extraordinarily grave."[11] If the third factor is also satisfied—i.e., if "the district court's decision to restrain [petitioners] was clear error as a matter of law"—then that is enough: "the *Bauman* analysis favors an exercise of … mandamus jurisdiction."[12]

In determining whether a district court that "holds a restriction on speech constitutional" has erred, this Court "conduct[s] an independent, de

---

[10] *Bauman*, 557 F.2d at 655.

[11] *See CBS*, 729 F.2d at 1177.

[12] *See CBS*, 729 F.2d at 1178; *see also Levine v. United States District Court*, 764 F.2d 590, 594 (9th Cir. 1985) ("The first two *Bauman* guidelines support an exercise of our mandamus jurisdiction. [Citations.] The fourth *Bauman* guideline does not apply … The fifth *Bauman* guideline is also inapplicable … Accordingly, the third *Bauman* guideline is critical."); *Sacramento Bee*, 656 F.2d at 481 ("The key factor is whether the … orders are so clearly erroneous as a matter of law that the *Bee*'s right to issuance of the writ is clear and indisputable.").

novo examination of the facts"[13] in order to "ensure the appropriate appellate protection of First Amendment values."[14] "[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge."[15]

There is a "credibility exception" to that de novo review, which leaves some room for deference to a district court's "findings of fact that turn on credibility determinations" but not to "a factfinder's findings [that] rely on its weighing of evidence and drawing of inferences."[16] Here, this Court's review should be de novo because there are no predicate credibility determinations, only findings that rely on the district court's "drawing of inferences."

---

[13] *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988).

[14] *See Newton v. NBC*, 930 F.2d 662, 670 (9th Cir. 1990).

[15] *Bose Corp. v. Consumers Union*, 466 U.S. 485, 501, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984).

[16] *See Newton*, 930 F.2d at 671.

# III.   BACKGROUND

## A.   Statement of the Case

SDCC sued petitioners for trademark infringement in 2014.[17] The case lay dormant for about two years while the parties participated in discussions involving a third-party interested in acquiring SLCC. Discovery began in earnest late last year.

Shortly after discovery closed, and based in part on documents produced and deposition testimony obtained late in discovery, petitioners made a motion[18] (which the district court ultimately denied[19]) for leave to add a counterclaim to cancel SDCC's trademark registrations because they were obtained through a fraudulent declaration of exclusive use. As they had done with other documents, petitioners posted these materials on

---

[17] *See* ECF Doc. 1. Except as otherwise indicated, district court filings are referenced by their ECF document numbers and cited by their own internal page and line numbering.

[18] *See* ECF Doc. 108.

[19] *See* ECF Doc. 202.

Facebook and on a page of the SLCC website that had been used to provide information about the litigation (the "Litigation Page").[20]

SDCC alleged that petitioners' fraud-related filings and internet postings indirectly disclosed some deposition testimony that was subject to protective order. Petitioners disagreed that any protected material had been disclosed but offered to redact the references SDCC complained of. SDCC, however, demanded that petitioners also stipulate to a far-reaching gag order. When petitioners refused, SDCC went to the district court.

**B.    The Suppression Orders**

Ultimately, SDCC obtained three suppression orders: a sweeping but short-lived oral order;[21] a second order that broadly suppresses comment on four major topics; and a more comprehensive subject-matter ban on *internet* speech. The first was superseded by a less objectionable, "more

---

[20] The Litigation Page was taken down last week, as ordered. It was formerly accessible at: ≪http://saltlakecomiccon.com/san-diego-comic-con-intl-v-salt-lake-comic-con/≫.

[21] *See* Transcript of "Telephonic Status Conference" ("June 28 Transcript," excerpted as Exhibit E hereto) at 27:1-13. Hearing transcripts are cited by their internal page and line numbering.

narrowly drawn" written order.[22] This petition seeks relief from the second and third.

## 1.    General Scope of the Orders

The second suppression order "prohibits Defendants from making comments"—except "in documents to be filed with the [district] Court"—that "relate to":

> Any statement that accuses, suggests, implies, or states that SDCC lied and/or committed fraud …
>
> Any statement about the genericness of the term comic con …
>
> Any statement about whether the term comic con is descriptive …
>
> Any statement about whether SDCC abandoned any trademark rights …[23]

More succinctly: the second suppression order prohibits petitioners from talking about fraud, genericness, descriptiveness, or abandonment—except in district court filings. Under a literal reading, the instant petition is a

---

[22] *See* ECF Doc. 119 at 2:22.

[23] "Order: (1) Granting in Part and Denying in Part Plaintiff's Motion for a Protective Order; …" ("Order 147," ECF Doc. 147, reproduced as Exhibit A hereto) at 2:6-3:5 (parenthetical numbering omitted).

violation of that order because it includes statements about genericness and fraud, and is not a district court filing.

The third suppression order is both broader and narrower than the second. Regarding subject matter, the third order is broader because it prohibits "all references to the pending litigation,"[24] not just references to the four topics suppressed by the second order. But instead of regulating speech in all contexts, like the second order, the third is limited to speech that occurs "on … websites and social media."[25]

### 2. Judicial Records and Other Public Documents

Regarding public documents, including judicial records, the second suppression order provides: "If Defendants … post, share, publish, or link public documents that relate to this case … they are **ORDERED** to publicize the documents in full or share a link to the *full* document."[26]

---

[24] "Amended Order … on Plaintiff's Motion for … Contempt …" ("Order 264," ECF Doc. 264, reproduced as Exhibit D hereto) at 2:10 (underlining in original); *see also* transcript of "Final Pretrial Conference/Motion Hearing" ("September 21 Transcript," excerpted as Exhibit G hereto) at 99:17-18 (""no further postings … about the case can appear").

[25] Order 264 at 2:11.

[26] Order 147 at 3:6-9 (boldface in original, italics added).

10

Pre-suppression, petitioners' practice had been to accompany any quotations with links to complete source documents, which would seem to be consistent with that. But orally, the district court clarified that petitioners should *only* link or publish complete documents, and not quote or otherwise draw attention to any particular passages:

> **[Counsel]:** … I think I heard … quotations are okay provided there is a link to the full document …
>
> **The Court:** No. No. What I said is you can re-publicize it by printing it in full or linking it to a full copy.[27]

The third suppression order goes beyond that. As written, the third order does not mention public documents. But orally, the district court has now *completely* suppressed them: "now I'm basically saying you post no documents about the issues in the case—no comment, no postings."[28]

### 3.    Mandatory Disclaimer

The second suppression order instructs petitioners:

> to note on the Salt Lake Comic Con website that the Court has ordered that *no editorial comments, opinions, or conclusions about the litigation* may be made *on social media* and that *no highlights or summaries* of the status of the

---

[27] July 14 Transcript at 28:16-23.

[28] September 21 Transcript at 108:19-21.

proceedings or the evidence presented will be made *on social media*.[29]

The order requires "[t]his disclaimer … to be placed prominently on the home page of the Salt Lake Comic Con website [and] social media site."[30] The district court later "clarif[ied] the breadth" of that provision, as follows:

> First … the disclaimer relates to any of the various media platforms that discuss the instant action … and applies to all of the Defendants including Defendant Brandenburg.
>
> Second … the disclaimer [should] be displayed in a place where a consumer would see it once it landed on Defendants' website. … [T]he disclaimer should be placed at the top of the SLCC website page …[31]

The mandated disclaimer that "no … comments … about the litigation may be made on social media" diverges from the rest of the second suppression order in ways reminiscent of the third suppression order. Thus the disclaimer is not limited to the four topics otherwise suppressed by the second order (i.e., fraud, genericness, descriptiveness, and abandonment) but instead reaches "the litigation" generally; and the

---

[29] Order 147 at 3:17-21 (italics added).

[30] Order 147 at 3:21-23.

[31] "Order Supplementing the Court's July 18 and 21, 2017 Orders" ("Order 215," ECF Doc. 215, reproduced as Exhibit C hereto) at 2:1-10.

disclaimer, unlike the other provisions of the second order, is limited to

social media.[32] Either the mandatory disclaimer revises the second order's

other provisions or the disclaimer that petitioners were ordered to post is

inaccurate.

SDCC never asked the district court to impose this mandate. Instead,

when the district court issued its first suppression order—the one that is no

longer in force or at issue—*petitioners'* counsel asked:

> If our clients' website and whatnot just goes totally dark,
> people are going to have questions. [¶] Are we permitted
> to say we've been instructed not to comment on the case …
> so people understand?

And the district court responded: "I think that is appropriate."[33] But the

district court's subsequent written orders transformed that permission into

a mandate.

The third suppression order, as written, preserves the disclaimer

requirement by "except[ing] the disclaimer ordered by the Court" from the

---

[32] *Compare* Order 147 at 2:24-27 ("the Court … prohibits Defendants from making comments on topics that relate to statements three through six listed above") *with id.* at 3:18-19 ("no editorial comments … about the litigation may be made on social media").

[33] June 28 Transcript at 32:20-25.

13

instruction "to remove <u>all</u> references to the pending litigation."[34] Orally, the district court offered petitioners a choice: (1) retain the oppressive mandate to "prominently" display a disclaimer across *all* internet platforms; or (2) "hold their water" and say *absolutely nothing* about the case, not even that they are under court order not to comment about the case.[35] The district court has denied to petitioners the option to say either nothing or that they have been suppressed—as, when, where, and to whom they see fit.

### 4. Attorney Fees

Finally, the third suppression order (but not the second) includes an attorney fee award.[36]

## C. Bases for the Suppression Orders

### 1. Second Suppression Order

"[B]efore a trial court can limit … first amendment rights … the record must contain sufficient specific findings by the trial court establishing … 'a serious and imminent threat to the administration of

---

[34] *See* Order 264 at 2:10-11.

[35] *See* September 21 Transcript at 91:5-15, 100:19-21.

[36] *See* Order 264 at 2:1-4.

justice.'"[37] Thus here, a few days after entering its second suppression order, the district court issued an additional document setting forth the following findings:

(1)   "through their range of online networks," petitioners "reach an extensive amount of people";

(2)   there is "evidence that demonstrates that the venire is being influenced through social media dialogue";

(3)   "trial is set for the end of November"; and

(4)   "as of [July 21, 2017], San Diego Comic Con is currently occurring, and Salt Lake Comic Con is set to begin in two months."[38]

The district court did not explain why the imminence of the parties' respective conventions matters. But whatever the reason, that factor has now dropped out because SDCC's convention ended on July 23 and petitioners' on September 23, 2017.

---

[37] *Chase v. Robson*, 435 F.2d 1059, 1061 (7th Cir. 1970).

[38] *See* "Order Granting in Part and Denying in Part Plaintiff's Motion for a Protective Order" ("Order 159," ECF Doc. 159, reproduced as Exhibit B hereto) at 8:17-18, 6:18, 6:23-7:1, 8:13-16.

As "evidence … that the venire is being influenced through social media dialogue" (finding 2) the district court quoted nine "Facebook user responses to Defendant Brandenburg's Facebook posts."[39] None of those users were identified as members of the jury pool and all nine posts relate to fraud; none relate to genericness, descriptiveness, or abandonment—the other banned topics.

## 2.    Third Suppression Order

The third suppression order originated in contempt proceedings based on the second. After the district court announced its intent to issue the second suppression order, but before entering it on the docket, it circulated a draft for comment. SDCC asked the district court to add that petitioners must retroactively "remove and/or modify" the Litigation Page of the SLCC website; petitioners objected that "plaintiff cited no authority for the proposition that defendants may now be ordered to retract and purge postings and statements" they had made before being suppressed;

---

[39] *See* Order 159 at 7:6–7.

16

and the district court entered its order *without* plaintiff's proposed modification.[40]

Because the district court did not adopt SDCC's request to order it purged or taken down, the Litigation Page stayed up, with all the content it had before petitioners were suppressed. SDCC brought a motion alleging contempt, focused primarily on supposed failures to comply with the disclaimer requirement but also alleging that petitioners were in contempt because they had not purged or taken down the Litigation Page.[41] The district court sidelined SDCC's disclaimer allegations, before the contempt motion was fully briefed, by entering a further order "to clarify … its previous orders";[42] and petitioners promptly complied with that "clarification." But the district court agreed that petitioners had violated

---

[40] *See generally* Exhibits H-K. The exhibits hereto have been branded with four-digit numbers that run sequentially through all 11 exhibits. With reference thereto, *see especially* Exhibit I at 0064-0065 (SDCC's proposed addition), Exhibit J at 0067-0068 (petitioners' response), Order 147 at 3:21 (order as entered, without SDCC's proposed addition).

[41] *See* ECF Doc. 207.

[42] *See* Order 215 at 1:25.

Order 147 by not retroactively purging the Litigation Page;[43] and "as a sanction," the district court entered its third suppression order.[44]

## IV.   ISSUES PRESENTED AND RELIEF SOUGHT

1.     Should the second suppression order be vacated because: (a) the district court's finding of a serious and imminent threat to the administration of justice cannot be sustained; (b) its internal inconsistency renders it unconstitutionally vague; and/or (c) it is not narrowly drawn?

2.     Should the third suppression order be vacated because: (a) there was no violation of the second suppression order to sanction petitioners for; and/or (b) it is not punitive, not coercive—but was imposed without the due process required for a criminal contempt sanction?

3.     Even if the second and third suppression orders are not vacated entirely, should (a) the restrictions on republication of judicial records and other public documents be lifted and (b) the disclaimer requirement be removed?

---

[43] *See* September 21 Transcript at 97:24–98:8; Order 264 at 2:27.

[44] *See* September 21 Transcript at 98:25-100:1; Order 264 at 1:24-25.

# V.   ARGUMENT

## A.   The Second Suppression Order Should Be Vacated (1) for Vagueness, (2) Because No Serious and Imminent Threat Was Shown, and (3) as Not Narrowly Drawn

### 1.   The Second Suppression Order Is Internally Inconsistent, Hence Unconstitutionally Vague

Although it suffers from graver defects, the second suppression order's most simply stated constitutional infirmity is uncertainty. As pointed out above, the second suppression order's disclaimer provision is at odds with its other terms. According to the disclaimer provision, petitioners are prohibited from commenting on *any* aspect of the case—but the order elsewhere suppresses only four specific topics; and according to the disclaimer, the prohibition extends only to social media—but the order elsewhere suppresses comments in *any* medium or setting (other than "documents to be filed with the [district] Court").[45]

A prior restraint "is unconstitutionally vague if it fails to give clear guidance regarding the types of speech for which an individual may be

---

[45] *Compare* Order 147 at 2:24-27 ("the Court … prohibits Defendants from making comments on topics that relate to statements three through six listed above") *with id.* at 3:18-19 ("no editorial comments, opinions, or conclusions about the litigation may be made on social media").

punished."[46] Because different provisions of the second suppression order give different and conflicting guidance as to subject matter and media, the order is unconstitutionally vague and should be vacated.

### 2. No Serious and Imminent Threat Justified the Second Suppression Order

A more grievous and fundamental failing of the second suppression order is that "a serious and imminent threat to the administration of justice,"[47] the essential predicate for any pretrial suppression order, was not shown.

Starting with first principles, "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity"[48] because "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."[49] "The presumption against prior restraints is heavier — and the degree of

---

[46] *See Levine*, 764 F.2d at 599.

[47] *See Craig*, 331 U.S. at 373.

[48] *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971).

[49] *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976); *see also* Order 159 at 3:25-26 ("based upon the nature of SDCC's requests … its protective order is a prior restraint").

protection broader—than that against limits on expression imposed by criminal penalties" because "a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them … beforehand."[50] Unless that "heavier presumption" has been rebutted, the district court's order is a clear error of law and this Court should exercise its mandamus jurisdiction to remedy the constitutional wrong.

"The *Nebraska Press* standard is an exacting one, and … allows a prior restraint only if its absence would prevent securing twelve jurors who could, with proper judicial protection, render a verdict based only on the evidence admitted during trial."[51] Because "[p]rior restraints are subject to strict scrutiny,"[52] "it is not enough for a court to decide that the fair trial right *may* be affected by the exercise of free speech. Nor is it enough … … to conclude … that the prior restraint has a rational basis."[53] Instead, "the district court's order may be upheld only if …: (1) the activity restrained

---

[50] *Southeast Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975).

[51] *Hunt v. NBC*, 872 F.2d 289, 295 (9th Cir. 1989).

[52] *Levine*, 764 F.2d at 595 (citations omitted).

[53] *Levine*, 764 F.2d at 603 (Nelson, J., concurring and dissenting).

poses either a clear and present danger or a serious and imminent threat to a protected competing interest" — here, the district court's ability to conduct a fair trial; "(2) the order is narrowly drawn; and (3) less restrictive alternatives are not available."[54]

Here, the district court found a "serious and imminent threat" justifying the second suppression order because:

(1)    any "dissemination of information by Defendants through their range of online networks … reach[es] an extensive amount of people";

---

[54] *Levine*, 764 F.2d at 595 (citations omitted). *Levine* discerned in Supreme Court precedent a "suggest[ion] that it is appropriate to impose greater restrictions on the free speech rights of trial participants than on the rights of nonparticipants," generally; and noted: "[t]he case for restraints on trial participants is especially strong with respect to attorneys." *Id.* But here the issue is party-litigant speech, not attorney speech — to which the justifications for regulating lawyers do not apply. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) ("lawyers in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be"); *Nebraska Press*, 427 U.S. at 601 n. 27 (Brennan, J., concurring in the judgment) ("As officers of the court, … attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice."). In any event, *Levine* itself still applied the three-part *Nebraska Press* test to restraints on party litigants, so there is no precedent for applying a different standard.

(2)     "the venire is being influenced" through that dissemination;

and

(3)     trial is near.[55]

As shown below, the evidence relied on by the district court does not

support its first two findings, and the third standing alone cannot show a

serious and imminent threat. Therefore the second suppression order

should be vacated.

> **a.      The Supposedly "Extensive" Reach of Petitioners' "Online Networks" Is Belied by San Diego's Populous and Metropolitan Character**

"[R]elevant factors in evaluating the likely impact of pretrial publicity

upon a community" include "whether the community itself is small and

rural, or large, populous, metropolitan and heterogeneous."[56] Where there

is a "large, diverse pool of residents eligible for jury duty, any suggestion

that 12 impartial individuals could not be empaneled … is hard to

---

[55] *See* Order 159 at 6:17-18, 6:23-7:1, 8:13-14. As noted above, the district court also mentioned the timing of the parties' conventions, but that is moot because both are now over.

[56] *Hunt*, 872 F.2d at 294.

sustain."[57] "[I]n a populous metropolitan area, the pool of potential jurors is so large that even in cases attracting extensive and inflammatory publicity, it is usually possible to find an adequate number of untainted jurors."[58]

### i. The Venue Is Large, Populous, and Metropolitan

Here, the district court "draws names of prospective jurors from the list of registered voters … in San Diego and Imperial Counties."[59] San Diego County has about 3.3 million residents, Imperial County about 200,000;[60] there are nearly 1.7 million registered voters in San Diego County and more than 72,000 in Imperial County, or about 1.75 million in both

---

[57] *Skilling v. United States*, 561 U.S. 358, 361, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010).

[58] *CBS*, 729 F.2d at 1181; *see also Hunt*, 872 F.2d at 294 ("whether the community itself is small and rural, or large, populous, metropolitan and heterogeneous" is "relevant … in evaluating the likely impact of pretrial publicity upon a community").

[59] https://www.casd.uscourts.gov/Jurors/SitePages/Home.aspx.

[60] *See* http://www.dof.ca.gov/Forecasting/Demographics/Estimates/E-1/documents/E-1_2017PressRelease.pdf.

counties combined.[61] The venue is "large, populous, metropolitan and

heterogeneous."[62]

### ii.   The Metrics Relied on by the District Court Are Not Relevant

According to the district court, "dissemination of information by

Defendants through their range of online networks would reach an

extensive amount of people" because:

> Defendant Brandenburg's Twitter feed has more than 5,200 followers, the Salt Lake Comic Con Twitter feed has more than 30,000 followers, there have been more than 200,000 media articles reporting on the instant case, and in 2014 Salt Lake Comic Con had more than 120,000 attendees.[63]

---

[61] http://elections.cdn.sos.ca.gov/ror/ror-pages/ror-odd-year-2017/county.pdf. More precisely: 1,677,468 in San Diego County and 72,282 in Imperial County.

[62] *See People v. Harris*, 623 P.2d 240, 247, 246 (Cal. 1981) (when trial was held in San Diego, "the populous metropolitan character of the community dissipated the impact of pretrial publicity" and "tipped the balance against venue change").

[63] Order 159 at 6:12-18.

The last figure, 120,000 attendees at the 2014 Salt Lake Comic Con, is irrelevant because no link was shown between convention attendance in Salt Lake City and tainting of the San Diego venire, 750 miles away.[64]

The largest number, "200,000 media articles," has to be digested. It cannot mean that 200,000 separate news reports have been written; that would be absurd. The explanation is found in one of the sources cited by the district court: "The Associated Press has written two articles on the issue, the last one of which was published in more than 160,000 news outlets worldwide."[65] Given that scale of distribution, two news reports distributed through AP's network is enough to account for the entire "200,000 media articles."

And that is worldwide: a more relevant inquiry might be how many of those articles appeared in San Diego news outlets, and with what circulation; but the record does not answer that question because SDCC provided no evidence of news coverage *in San Diego*. SDCC did not, for

---

[64] San Diegans have what SDCC calls "the focal point for the world of comics conventions" happening right in their backyard, *see* https://www.comic-con.org/about; why assume 120,000 of them traveled 750 miles to attend the Salt Lake upstart?

[65] ECF Doc. 126-5 at 4, Exhibit 3 p. 17.

26

example, show which newspapers or television stations picked up the stories, or what their circulation or viewership is.

Moreover no connection was shown between statements by petitioners and either the frequency or content of news reports. Telling against any direct correlation: the district court's summary judgment ruling came after its second suppression order; but the Associated Press still covered the ruling, with no encouragement or input from the muzzled petitioners.[66]

That leaves 35,000 followers of petitioners' twitter feeds. But again, nothing in the record shows how many of those followers are part of San Diego's jury pool, if any, or how many are current (rather than former) followers. And even if they all were, that would be just 2% of the pool—which under this Court's jurisprudence is inconsequential.[67]

---

[66] *See* https://www.usnews.com/news/best-states/california/articles/ 2017-09-13/comic-con-court-battle.

[67] *See Hunt*, 872 F.2d at 295 ("[T]he jury pool in San Mateo County … exceeded … NBC projected that 15% of adults in San Mateo County would watch the broadcast; ultimately, approximately 21.3% watched. Even taking into account any possible 'ripple effect' … there remains an extremely large pool of untainted potential jurors from which to draw twelve.").

### iii. The District Court Disregarded Alternatives and Misapprehended the Relevant Inquiry

The district court's fixation on petitioners' online reach and following is also misguided because it disregards "less restrictive alternatives,"[68] including alternatives the district court is already implementing. Specifically, the district court has prepared a questionnaire to explore potential jurors' "familiarity … with either or both defendants," screen for "some relationship, affinity, whatever … -- or animosity -- … and their exposure, if any, to any pretrial publicity," and weed out those with "any ax to grind."[69] If any of the nine Facebook users who posted sympathetic comments or 35,000 twitter followers mentioned by the district court *are* potential jurors and do receive the questionnaire—the odds are vanishingly small—they will be excluded from service based on the questionnaire.

In a related vein, the district court waved aside the national character of petitioners' online outreach as follows: "to argue that Defendants' posts are meant to target the community of comic fans instead of the San Diego

---

[68] *See Levine*, 764 F.2d at 595

[69] *See* July 14 Transcript at 51:8-9, 52:7; September 21 Transcript at 49:23-50:1.

citizenry completely flouts the fact that the 'Comic Fandom' community is logically inclusive of San Diego comic fans."[70] That rejoinder might be more compelling if the relevant inquiry were whether *any* potential jurors *might* be influenced. But that is not the standard. The standard is whether the "absence" of a prior restraint "would prevent securing twelve jurors who could, with proper judicial protection, render a verdict based only on the evidence admitted during trial."[71]

"Given the large, diverse pool of residents eligible for jury duty, any suggestion that 12 impartial individuals could not be empaneled … is hard to sustain."[72] And on this record, it has not been.

### b. The Evidence the District Court Cited Does Not Show that the Venire Is Being Influenced

In addition to the numbers considered above, the district court also cites "evidence that demonstrates that the venire is being influenced through social media dialogue."[73] The evidence consists of nine sympathetic comments to petitioners' initial post of "the fraudulent

_____

[70] *See* Order 159 at 8:9-11.

[71] *Hunt*, 872 F.2d at 295.

[72] *Skilling*, 561 U.S. at 361.

[73] Order 159 at 6:23-7:1.

statement [SDCC] used to obtain their trademarks [i.e., trademark registrations from the PTO] when they knew there were many comic cons out there."[74] Out of 35,000 followers, nine were "influenced" enough to comment. And *no evidence* suggests *any* of them live *in San Diego*. That hardly "demonstrates that the venire is being influenced through social media."

The district court also noted that:

> Defendants' websites and social media applications are packed with comments such as "'Comic Con' is generic," "SDCC declared false information to obtain the 'Comic Con' trademark," and the Salt Lake Comic Con website has an entire section devoted to the instant matter with subheadings titled "Comic Con is generic."[75]

But "relevant factors in evaluating the likely impact of pretrial publicity upon a community" include "whether the subject matter of the case is lurid or highly inflammatory"[76]—and genericness is hardly "lurid or highly inflammatory." Moreover "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically … to an unfair

---

[74] *See* Order 159 at 7:1–21.

[75] Order 159 at 7:22–26.

[76] *Hunt*, 872 F.2d at 294.

30

trial,"[77] and the district court cited no evidence that the genericness comments that "packed" petitioners' "websites and social media applications" has had *any* effect on the venire.

There simply is no evidence "that the venire is being influenced."[78]

### c. The Nearness of Trial Cannot, without More, Justify a Prior Restraint

Without more, the nearness of trial weighs at least as heavily *against* prior restraints as in favor, because that is "the precise time when public interest in the matters discussed would naturally be at its height" and "[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech … bears an inverse ratio to the timeliness and importance of the ideas seeking expression."[79] To conclude otherwise—to allow the nearness of trial, of itself, to justify prior restraints—would be to countenance "[a]n endless series of moratoria on public discussion" about first one case and then another, as they work their way through the system

---

[77] *See Nebraska*, 427 U.S. at 565.

[78] *Cf.* Order 159 at 6:23.

[79] *See Bridges v. California*, 314 U.S. 252, 268-69, 62 S. Ct. 190, 86 L. Ed. 192 (1941).

and near trial, which "could hardly be dismissed as an insignificant abridgment of freedom of expression."[80]

Of the district court's four findings in support of its second suppression order, one is moot because the parties' conventions are over and two are unsustainable because there is no evidence of petitioners' supposedly "extensive reach" *within the venue* or that the venire is being influenced. That leaves only the fact that trial is approaching, which cannot alone warrant the imposition of any prior restraints. Therefore the second suppression order should be vacated.

### 3. The Second Suppression Order Is Not Narrowly Drawn

Even where "a serious and imminent threat" is shown, any prior restraint must be "narrowly drawn" to that threat.[81] Here, the district court's findings all have to do with "social media dialogue" prompted by "Defendant Brandenburg['s] use" of "various websites and social media pages to voice … opinions on the merits of their case."[82] The only evidence cited to show that opinions have actually been affected by Mr.

---

[80] *See Bridges*, 314 U.S. at 269.

[81] *Levine*, 764 F.2d at 595.

[82] *See* Order 159 at 6:19-7:1.

32

Brandenburg's online commentary is "Facebook user responses to Defendant Brandenburg's Facebook posts" about petitioners' fraud claim.[83] Thus, if a threat to the integrity of the venire had been shown, it would be a threat posed by Mr. Brandenburg's online commentary about fraud.

As shown above, the district court's predicate findings are unsustainable. But even if they could be sustained—even if the nine posts about fraud could be traced to San Diego, and even if nine were more than a tiny percentage of the jury pool—they would have supported only a restraint against Mr. Brandenburg (not all petitioners) commenting on fraud (not genericness, descriptiveness, or abandonment) on social media (not in other settings). Therefore the second suppression order is not narrowly drawn and should be vacated.

## B.   The Third Suppression Order Should Be Vacated

### 1.   Allowing the Legacy Litigation Page to "Continue to Persist" Did Not Violate the Second Suppression Order

The district court imposed its *third* suppression order "as a sanction" for violating its *second* suppression order by not purging legacy content from the SLCC website's Litigation Page—"not that they were posted after

---

[83] *See* Order 159 at 7:1-21.

the court's orders, but they have remained," "they continue to persist."[84] Because the second suppression order cannot fairly be construed to have required petitioners to purge the Litigation Page, the district court should not have sanctioned petitioners by entering the third suppression order.

As issued, the second suppression order "prohibits Defendants from making comments on [suppressed] topics."[85] That language is prospective. Nothing in the order has any retroactive application or requires petitioners to do anything about content that had already been posted. Prior restraints "are narrowly construed";[86] so construed, the second suppression order did not require petitioners to purge legacy content from the Litigation Page.

Looking beyond the language of the second suppression order, as explained above: SDCC asked the district court to include in its second suppression order a requirement that petitioners retroactively purge the Litigation Page; petitioners objected; and the district court *did not* include

---

[84] *See* September 21 Transcript at 98:25, 98:3-6.

[85] Order 147 at 2:24.

[86] *See Rodríguez-Vázquez v. Solivan*, 844 F.3d 351, 355 (1st Cir. 2016).

34

that provision in its final order.[87] Even without the canon of narrow construction, the only reasonable way to read the second suppression order in light of that record is that it did not require petitioners to purge the Litigation Page.

Because the second suppression order could not properly be stretched to require that petitioners take down or purge the Litigation Page, petitioners did not violate the second suppression order and the district court should not have sanctioned them by entering its third suppression order.

### 2. The Third Suppression Order Amounts to a Criminal Contempt Sanction Imposed Without Due Process

So far as petitioners are aware, imposing a prior restraint *not* to protect the competing constitutional interest in a fair trial but to sanction the violation of some other court order is unprecedented. Unless this Court embraces a new ground for depriving citizens of their First Amendment rights, that alone is reason to vacate the third suppression order.

Another is that the third suppression order amounts to a criminal contempt sanction, imposed without due process. Despite finding that

_____

[87] *See* Exhibit I at 0064-0065, Exhibit J at 0067-0068, Order 147 at 3:21.

35

petitioners "are not in contempt of court," the district court also found

"that Defendants did violate the Court's previous orders" then sanctioned

them[88]—and the *absence* of contempt cannot *diminish* the procedural

protections to which petitioners were entitled: whether or not the district

court called the violation "contempt," "the principles … articulated

for cases of contempt … guide our determination of what procedural

protections are necessary in imposing sanctions" for it.[89]

    "If the purpose of the court's order is to punish past defiance and to

vindicate the court's judicial authority, it is a criminal sanction."[90] "Civil

contempt sanctions, by contrast, are employed for two purposes: to coerce

the defendant into compliance with the court's order, and to compensate

the complainant for losses sustained."[91] "If a sanction operates whether or

not a party remains in violation of the court order, it does not coerce

compliance."[92] "[W]here the elements of both civil and criminal are mixed,

---

[88] *See* Order 264 at 1:24-26.

[89] *See F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1137 (9th Cir. 2001).

[90] *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).

[91] *Whittaker*, 953 F.2d at 517.

[92] *Whittaker*, 953 F.2d at 517.

the sanctions are reviewed under the procedural requirements of criminal contempt."[93]

The third suppression order (1) awarded attorney fees to SDCC and (2) greatly expanded the restrictions on petitioners' expressive conduct, both by extending proscribed subject matter (for online postings, at least) from the four topics that the second suppression order suppressed to "<u>all</u> references to the pending litigation"[94] and by stripping petitioners' right to post public documents altogether.[95] The attorney fee award is compensatory, hence civil. But the rest is criminal because it is neither compensatory nor coercive: it is not compensatory because it does not compensate SDCC for some harm it suffered as a result of the legacy Litigation Page not being taken down sooner; it is not coercive because petitioners cured the alleged violation of the second suppression order by

---

[93] *Whittaker*, 953 F.2d at 518.

[94] *See* Order 264 at 2:10.

[95] September 21 Transcript at 108:19-21.

taking the Litigation Page before the court even entered its third

suppression order on the docket, but still the restraints continue.[96]

Because the third suppression order combines elements of both civil

and criminal contempt, it must be "reviewed under the procedural

requirements of criminal contempt"[97]—which it fails, because: (1) FEDERAL

RULE OF CRIMINAL PROCEDURE 42 was not followed; (2) no *willful*

disobedience was (or could have been) found; and (3) willfulness and

disobedience were not "proved beyond a reasonable doubt."[98]

**C.   Even if Either Suppression Order Were Sustained, Petitioners Should Not Be (1) Forbidden to Republish or Quote from Public Documents (Including Judicial Records) or (2) Required to Post a Disclaimer**

The second and third suppression orders should be vacated, entirely.

But even if some part of them were allowed to stand, still this Court should

restore petitioners' right to quote from and republish public documents

and relieve them of the disclaimer requirement.

---

[96] *See Whittaker*, 953 F.2d at 517 ("If a sanction operates whether or not a party remains in violation of the court order, it does not coerce compliance.").

[97] *Whittaker*, 953 F.2d at 518.

[98] *See Whittaker*, 953 F.2d at 517.

### 1. Republication of Already Public Documents Should Not Be Proscribed

Considering first public documents, "[t]ruthful reports of public judicial proceedings have been afforded special protection."[99] "What transpires in the court room is public property. … Those who see and hear what transpired can report it with impunity."[100] This applies to court *records* as well as *proceedings*.[101]

The right to truthfully report public judicial records has one limitation: he who makes and then disseminates defamatory claims in a court filing, to persons and for reasons wholly unrelated to the judicial proceeding, may be answerable in tort.[102] But even where after-the-fact tort liability might attach, "prior restraints are not permitted to stop the publication of a defamatory statement"[103] in advance. Moreover here,

---

[99] *Nebraska*, 427 U.S. at 559.

[100] *Craig*, 331 U.S. at 374.

[101] *See Cox*, 420 U.S. at 496 ("the First … Amendment[ ] will not allow … liability for truthfully publishing information released to the public in official court records").

[102] *See* RESTATEMENT (SECOND) OF TORTS, § 587.

[103] *See Gilbert v. National Enquirer, Inc.*, 51 Cal. Rptr. 2d 91, 96 (Ct. App. 1996).

petitioners are forbidden to report the contents of *any* records, even the district court's own orders, which no one suggests are defamatory. So far as petitioners can tell, the district court's prior restraint against "truthfully publishing information released to the public in official court records"[104] is unprecedented.

Nor should petitioners be barred from republishing or quoting from other public records, such as third-party press reports. What the press has already reported is already in the public domain. Barring petitioners from disseminating what is already in the press protects the venire from nothing it is not already exposed to.

## 2. The Counterproductive Disclaimer Mandate Should Be Undone

If any prior restraint survives this Court's review, petitioners should be *permitted* to say they have been restrained, when and to whom they will, without being *required* to. The mandatory disclaimer requirement should be undone.

---

[104] *See Cox Broadcasting*, 420 U.S. at 496; *see also Craig*, 331 U.S. at 374 ("What transpires in the court room is public property.").

First, the disclaimer mandate is a further "constitutional harm" because "[t]he First Amendment prohibits … being forced to speak rather than to remain silent."[105] Second, the mandatory disclaimer bears no relation to the district court's findings because far from *discouraging* "social media dialogue"[106] about the case, the disclaimer has actually encouraged it.[107] Third, the petitioners should not be forced to make the Hobson's choice between (1) acquiescing in the continued infringement of their right to remain silent, by retaining the unduly intrusive disclaimer mandate, or (2) saying *nothing*, not even that they have been suppressed, when they want to explain their silence.

The only apparent purpose served by *requiring* petitioners to "prominently" display a disclaimer across all their corporate and personal websites and social media pages, where a visitor "would [unavoidably] see

---

[105] *See Axson-Flynn*, 356 F.3d at 1284 n. 4.

[106] *Cf.* Order 147 at 6:23-7:1 ("the venire is being influenced through social media dialogue").

[107] As SDCC observed in its contempt motion: "[a]s of August 1, 2017, … more than 90 people chose to comment on the disclaimer" and "[t]he disclaimer required by the Court … invites public commentary or discourse about the lawsuit …" ECF Doc. 207-1 at 10:4-5, 11-13.

it once it landed on Defendants' website,"[108] as the price of being able to explain their silence, is to shame them—which is a more "serious and imminent threat to the administration of justice"[109] than anything cited by the district court to justify its orders.

## VI.   CONCLUSION

This Court should intervene to alleviate the "extraordinarily grave" damage[110] being done to petitioners by the district court's unconstitutional suppression orders.

DATED: September 27, 2017

/s/ L. Rex Sears

MICHAEL I. KATZ
*mkatz@mabr.com*
L. REX SEARS
*rsears@mabr.com*
   MASCHOFF BRENNAN PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone: (435) 252-1360

*Attorneys for Defendants–Petitioners*

---

[108] *See* Order 215 at 2:1-9.

[109] *See Craig v. Harney*, 331 U.S. at 373.

[110] *See CBS*, 729 F.2d at 1177.

## CERTIFICATE OF COMPLIANCE

1.      This petition complies with the type-volume limitation of

Federal Rule of Appellate Procedure 21(d)(1) because the petition contains

7,718 words.

2.      This petition complies with the typeface requirements of

Federal Rule of Appellate Procedure 32(a)(5) and the type style

requirements of Federal Rule of Appellate Procedure 32(a)(6) because this

petition has been prepared in proportionally spaced roman-style typeface

using Microsoft Word in 14-point Book Antiqua font.

DATED: September 27, 2017            /s/ *L. Rex Sears*
                                    L. Rex Sears
                                    *Attorney for Defendants–Petitioners*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, defendants-petitioners Dan Farr Productions, LLC, Daniel Farr, and Bryan Brandenburg state they are not aware of any related cases pending before this Court.

DATED: September 27, 2017      /s/ *L. Rex Sears*

                                          L. Rex Sears
*Attorney for Defendants–Petitioners*

## CERTIFICATE OF SERVICE

I, L. Rex Sears, counsel for defendants-petitioners Dan Farr Productions, Daniel Farr, and Bryan Brandenburg, certify that on this 27th day of September, 2017, the foregoing **PETITION FOR WRIT OF MANDAMUS** was filed electronically with the U.S. Court of Appeals for the Ninth Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail and/or hand delivery:

> Callie A. Bjurstrom, Esq.
> *callie.bjurstrom@pillsburylaw.com*
> Peter K. Hahn, Esq.
> *peter.hahn@pillsburylaw.com*
> Michelle A. Herrera, Esq.
> *michelle.herrera@pillsburylaw.com*
> **PILLSBURY WINTHROP SHAW PITTMAN, LLP**
> 501 West Broadway, Suite 1100
> San Diego, CA 92101
> Telephone: (619) 544-3107
> *Attorneys for Plaintiff–Real Party in Interest*
>
> Honorable Anthony J. Battaglia (hand delivery via courier)
> Courtroom 4A, Suite 4135
> 221 West Broadway
> San Diego, CA 92101

DATED: September 27, 2017          /s/ *L. Rex Sears*
                                          L. Rex Sears
                                          *Attorney for Defendants–Petitioners*

45