IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re: DAN FARR PRODUCTIONS; BRYAN BRANDENBURG; DANIEL FARR. | ) ) ) ) ) |
| DAN FARR PRODUCTIONS; DANIEL FARR; BRYAN BRANDENBURG, Petitioners, vs. UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO, Respondent, SAN DIEGO COMIC CONVENTION, Real Party in Interest. | ) No. 17-72682 ) ) (Southern District of California, ) San Diego No. 3:14-cv-01865- ) AJB-JMA) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**ANSWER OF REAL PARTY IN INTEREST SAN DIEGO COMIC CONVENTION TO PETITION FOR WRIT OF MANDAMUS**

PILLSBURY WINTHROP
 SHAW PITTMAN LLP
CALLIE R. BJURSTROM
PETER K. HAHN
MICHELLE A. HERRERA
501 West Broadway, Suite 1100
San Diego, CA 92101
Telephone:  (619) 234-5000

PILLSBURY WINTHROP
 SHAW PITTMAN LLP
KEVIN M. FONG
Four Embarcadero Center,
22nd Floor
San Francisco, CA 94111
Telephone:  (415) 983-1000

Attorneys for Real Party in Interest, San Diego Comic Convention

## <u>CORPORATE DISCLOSURE STATEMENT</u>

San Diego Comic Convention ("SDCC") is a California non-profit corporation.  There is no parent corporation of SDCC, and no corporation owns 10% or more of SDCC stock.

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ....................................................................................1

STATEMENT OF FACTS .......................................................................1

    A.    San Diego Comic Convention and the COMIC-CON
Trademarks.............................................................................1

    B.    Defendants' Appropriation and Use of SDCC's Trademarks..............3

    C.    The Parties' Countervailing Claims and Defenses ............................5

STATEMENT OF THE CASE...................................................................7

    A.    SDCC's Motion for Protective Order .........................................7

    B.    The Hearing on SDCC's Motion for Protective Order ........................9

    C.    The District Court's Suppression Order..............................................10

    D.    Defendants Failed to Comply with the Suppression Order................15

    E.    SDCC's Motion for an Order to Show Cause....................................16

    F.    The District Court's Supplemental Order. .........................................17

    G.    The District Court's Amended Order.................................................17

ARGUMENT ..........................................................................................18

I.    BACKGROUND:  DEFENDANTS' BURDEN IN SEEKING A
WRIT OF MANDAMUS. ..............................................................18

II.    DEFENDANTS HAVE FAILED TO SHOW THAT THE DISTRICT
COURT'S ORDERS ARE CLEARLY ERRONEOUS AS A
MATTER OF LAW.........................................................................19

    A.    Defendants publicly campaigned to taint the outcome of this
case by adjudicating the parties' dispute in the media instead of
the courtroom. ...................................................................19

B.    Defendants have failed to show that the District Court's Suppression Order is clearly erroneous as a matter of law. ...............27

C.    Defendants failed to comply with the Suppression Order .................32

    1.    Defendants failed to prominently place the disclaimer on the home page of the Salt Lake Comic Con website ...............32

    2.    Defendants failed to prominently place the disclaimer on the Salt Lake Comic Con Facebook page ................................33

    3.    Defendant Brandenburg failed to place any disclaimer whatsoever on his Facebook page .............................................34

    4.    The section of the Salt Lake Comic Con website devoted to this lawsuit violated the Suppression Order ........................35

D.    Defendants have failed to show that the District Court's Amended Order is clearly erroneous as a matter of law. ...................36

CONCLUSION ...................................................................................................39

STATEMENT OF RELATED CASES ...................................................................40

CERTIFICATION OF COMPLIANCE PURSUANT TO FED. R. APP. P. 21(d)(1) .........................................................................................................41

iii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Allied Chem. Corp. v. Daiflon, Inc.,*
  449 U.S. 33 (1980) ................................................................................18

*Bauman v. United States Dst. Court,*
  557 F.2d 650 (9th Cir. 1977) ..............................................................19

*Calderon v. Unites States Dist. Court,*
  103 F.3d 72 (9th Cir. 1996) ................................................................18

*In re Perez,*
  749 F. 3d 849 (9th Cir. 2014) .............................................................19

*Islamic Shura Council of Southern Calif. V. Federal Bureau of Investigation,*
  635 F. 3d 1160 (9th Cir. 2001) ...........................................................18

*Levine v. United States Dist. Court for Cent. Dist.,*
  764 F.2d 590 (9th Cir. 1985) .................................................. 29, 30, 32

*Patterson v. Colorado,*
  205 U.S. 454 (1907) ...............................................................................30

*Plata v. Brown,*
  754 F. 3d 1070 (9th Cir. 2014) ...........................................................19

*Whittaker v. Execuair Corp.,*
  953 F.2d 510 (9th Cir. 1992) ...............................................................38

### Statutes and Codes

United States Code
  Title 15, Section 1114 ..............................................................................5
  Title 15, Section 1125(a) ..........................................................................5

### Rules and Regulations

Federal Rules of Appellate Procedure
  Rule 21(d)(1) ...........................................................................................41
  Rule 28-2.6 ..............................................................................................40

## **INTRODUCTION**

Defendants have failed to show that the District Court's orders are clearly erroneous as a matter of law. The District Court properly found that there was a serious and imminent threat to the administration of justice. Defendants' activities created a threat to the selection of an impartial jury, as well as the risk that jurors would find improper material online. In light of the circumstances, the District Court did not abuse its discretion in issuing its suppression orders. Defendants' petition for writ of mandamus should be denied.

## **STATEMENT OF FACTS**

### A.   **San Diego Comic Convention and the COMIC-CON Trademarks**

San Diego Comic Convention ("SDCC"), a non-profit organization, was incorporated in California in 1975. SDCC produces the convention known as the Comic-Con convention, which has been held in San Diego, California annually since 1970. For over two decades, the Comic-Con convention has been held at the same location, the San Diego Convention Center. The Comic-Con convention showcases and celebrates comic art and comic books, and various other aspects of the popular arts such as graphic arts, science

1

fiction, films, television, fantasy films and literature. *See* Exhibits to Answer ("EX"), p. 33.

The Comic-Con convention has grown in popularity and attendance since its inception. Attendance at the Comic-Con convention held in July 2016 exceeded 135,000 over the course of three-plus days. *Id.* Owing in large part to the extraordinary amount of time, effort and expense invested by SDCC in its convention and its brand, the Comic-Con convention has become the premier comic book and popular arts convention in the world. The Comic-Con convention is diverse and expansive, and offers an extensive schedule of several hundred events, including anime and film screenings, panel discussions, autograph areas, workshops, educational and academic programs, games, award ceremonies, a costume contest, art shows and portfolio reviews for aspiring artists. Thousands of celebrities, literary and film authors, and other special guests have appeared at the Comic-Con convention over the years. In addition, a vast array of movie studios, television networks, Internet companies, and comic and book publishers hold presentations each year. SDCC has spent decades developing and refining the substance and structure of the Comic-Con convention and the events showcased at the convention,

and cultivating relationships with the various creators, authors, artists, actors, directors, producers, writers and artists who appear at the convention.  EX, pp. 33-34.

SDCC markets its Comic-Con convention nationwide and internationally under the "COMIC-CON" service marks, including the following marks registered with the United States Patent and Trademark Office ("USPTO"):

| | |
|---|---|
|  | U.S. Service Mark Reg. No. 3,221,808 |
| **COMIC-CON** | U.S. Service Mark Reg. No. 3,219,568 |
| **COMIC CON INTERNATIONAL** | U.S. Service Mark Reg. No. 2,218,236 |
| **ANAHEIM COMIC-CON** | U.S. Service Mark Reg. No. 4,425,806 |

The registrations for the above-identified marks (collectively referred to herein as the "COMIC-CON marks") were duly issued by the USPTO, are valid and are in full force and effect.  EX, pp. 53-62.

**B.     Defendants' Appropriation and Use of SDCC's Trademarks**

In or about late 2012 or early 2013, Defendants made the conscious decision to capitalize on the reputation, goodwill and brand value associated with the COMIC-CON marks by creating and

operating a comic convention in their home state of Utah under the infringing name, "Salt Lake Comic Con." EX, p. 90. Defendants were aware of SDCC's COMIC-CON marks prior to selecting the name for their Salt Lake Comic Con convention, and knew that SDCC used the COMIC-CON marks in connection with its Comic-Con convention. EX, p. 89. Prior to forming Defendants' convention, Mr. Brandenburg researched the USPTO files for marks owned by SDCC and located SDCC's federal registrations for the COMIC-CON marks. EX, p. 120. For whatever reason, Defendants surmised that they were free to use the term "comic con" as part of the name of their convention, so long as the term did not include a hyphen between "comic" and "con." EX, pp. 78-80, 94-95, 118.

Defendants held their inaugural Salt Lake Comic Con convention in September 2013. Defendants engaged in an aggressive campaign to trade off of the reputation, goodwill and brand value associated with the COMIC-CON marks. Such actions continue to this day. Defendants have now held five conventions under the name Salt Lake Comic Con. *See* EX, p. 73. Defendants also created a second convention that likewise infringes SDCC's COMIC-CON marks – Salt Lake Comic Con FanXperience –that has been held

4

annually since 2014. *Id*. Since 2013 Defendants have held nine conventions under names that infringe SDCC's incontestable trademark rights in the COMIC-CON marks.

Defendants' logo likewise features the "Comic Con" mark.

 

Defendants place nearly all of the emphasis on the term "Comic Con" in their logo and advertising materials, with the font size for that term dwarfing the "Salt Lake" geographical descriptor. Defendants admit that they engaged in a marketing campaign with the lure that "Comic Con is coming to Utah." EX, pp. 115-116. Defendants also admit that they truncate the names of their conventions to "Comic Con." EX, pp. 74, 140.

### C.    The Parties' Countervailing Claims and Defenses

SDCC's Complaint against Defendants alleges causes of action for (1) federal trademark infringement under 15 U.S.C. § 1114, and (2) false designation of origin under 15 U.S.C. § 1125(a). EX, pp. 11-14. SDCC contends that Defendants' use of the COMIC-CON marks in connection with their comic conventions operated under the names

"Salt Lake Comic Con" and "Salt Lake Comic Con FanXperience" constitute both trademark infringement and false designation of origin under the Lanham Act. SDCC further contends that Defendants' use of SDCC's COMIC-CON marks in connection with the operation of their website (www.saltlakecomiccon.com) and various social media sites (*i.e.* Facebook) likewise constitutes trademark infringement and false designation of origin, as does Defendants' sale of various types of merchandise bearing the infringing marks. *See* EX, pp. 6-7. SDCC further alleges that Defendants willfully and intentionally infringed SDCC's COMIC-CON marks. EX, p. 10.

Defendants filed a Counterclaim against SDCC alleging two causes of action for (1) a declaratory judgment of non-infringement, and (2) a declaratory judgment of trademark invalidity and cancellation. EX, pp. 29-30. Defendants contend that they do not infringe SDCC's COMIC-CON marks. Defendants also contend that SDCC's marks are invalid because they are generic and SDCC has abandoned them. *Id*.

## STATEMENT OF THE CASE

### A.    SDCC's Motion for Protective Order

On June 28, 2017, the District Court held a status conference to address hearing dates and briefing schedules for various pending motions, as well as pretrial dates.  The subject matter of Defendants' reporting and commenting on this lawsuit on their websites and social media sites arose.  The District Court expressed a concern that Defendants' conduct in this regard could taint the venire, cautioned Defendants against attempts to try this case in the court of public opinion instead of the judicial system, and invited SDCC to file a motion on these issues.  EX, pp. 163-171.

SDCC filed a motion for protective order on July 6, 2017.  EX, p. 178.  SDCC argued that Defendants had engaged in a campaign to use social media, the Internet and traditional media to comment on the merits of the parties' legal positions in this case, editorialize public filings and to wage personal attacks on SDCC's officers and board members, all in an effort to taint the public's perception of SDCC and the claims and defenses at issue in this lawsuit.  SDCC argued that Defendants' conduct in this regard threatened the judicial integrity of this case and SDCC's right to a fair trial, and presented a very serious

danger of tainting the venire.  In support of its motion, SDCC

submitted samples of Defendants' offending publications, most often

authored by Defendant Brandenburg, including:

- An interview given by Brandenburg in August 2014 where he stated Defendants' intent to win this case in the "court of public opinion."  EX, p. 203.

- A June 2017 press release incorrectly touting that Defendants had proven SDCC engaged in fraud before the United States Patent & Trademark Office, that SDCC abandoned it trademarks and that the marks are generic. EX, pp. 206-209.

- Brandenburg's republishing of and commenting on news articles regarding the merits of the case on his personal Twitter feed.  EX, pp. 219.

- Defendants' republishing of and commenting on news articles regarding the merits of the case on the Salt Lake Comic Con Twitter feed.  EX, pp. 221-225.

- Brandenburg's extensive reporting and commenting on the merits of the case on his personal Facebook page, including a statement that SDCC had

committed a felony in connection with the prosecution of its trademarks. EX, pp. 228-239.

- Brandenburg's reporting and commenting on the merits of the case on third party Facebook pages. EX, pp. 241-261.

- Defendants' extensive reporting and commenting on the merits of the case and on publicly filed documents on their website located at www.saltlakecomiccon.com. EX, pp. 263-305.

Defendants filed an opposition to SDCC's motion on July 13, 2017.

### B. The Hearing on SDCC's Motion for Protective Order

The District Court heard oral argument on SDCC's motion on July 14, 2017. EX, p. 306. The District Court noted that this is a case of high public interest involving parties who are savvy when it comes to social media, and one where there is a potential for interference with the parties' right to a fair trial if Defendants' personal opinions about the merits of the case on social media are left unchecked. EX, p. 309. The District Court found that "[t]here has been no end to

9

discussion about this [case], and a variety of exhibits . . . demonstrate that the public is now engaged in a discussion, in part, based upon opinions expressed by Mr. Brandenburg in his social media." EX, p. 313. The District Court further found that Brandenburg's opinions concerned issues that are ultimately for the jury, and that Defendants' "continued pretrial publicity" in certain areas presents a "serious and imminent threat to the administration of justice here, and the potential for injury to the integrity of the judicial process." EX, pp. 313-314.

The District Court stated an intent to impose a suppression order on what the Court referred to as "items three through six" identified in SDCC's moving papers, finding "in this unusual case that by a very high standard of proof the threat of an unfair trial polluting or poisoning the venire is here." EX, p. 314. The District Court cautioned that any violation of the order might subject Defendants to contempt. EX, p. 339.

## C.    The District Court's Suppression Order

The District Court issued its initial Order on SDCC's motion on July 18, 2017. *See* Exhibits in Support of Petition ("Pet. Ex."), p. 2. Based on "evidence that the venire is being influenced through social

media dialogue," the District Court's Order "prohibits Defendants from making comments on topics" that relate to the following:

- Any statement that accuses, suggests, implies or states that SDCC lied and/or committed fraud [referred to as "Item 3"];

- Any statement about the "genericness" of the term comic con [referred to as "Item 4"];

- Any statement about whether the term comic con is descriptive [referred to as "Item 5"]; and

- Any statement about whether SDCC abandoned any trademark rights [referred to as "Item 6"].

Pet. Ex., p. 3. Documents filed by Defendants with the District Court are exempt from these enumerated restrictions. *Id*.

The District Court issued a further prohibition against Defendants regarding public documents they may wish to publish or link on their social media platforms or websites:

> If Defendants wish to post, share, publish, or link public documents that relate to this case to any of their social media platforms or websites, they are **ORDERED** to publicize the documents in full or share a link to the full document. Defendants are not to enhance the post with any comments, opinions, editorials or conclusions that relate

> to the foregoing statements that have been
> deemed suppressed by this Order[.]

*Id*.

Lastly, the District Court ordered Defendants to make the

following disclaimer on their websites and social media sites.

> Defendants are **ORDERED** to note on the
> Salt Lake Comic Con website that the Court
> has ordered that no editorial comments,
> opinions, or conclusions about the litigation
> may be made on social media and that no
> highlights or summaries of the status of the
> proceedings or the evidence presented will
> be made on social media. This disclaimer is
> to be placed prominently on the home page
> of the Salt Lake Comic Con website, social
> media site, and any print or broadcast
> advertisement or press release that makes
> reference to San Diego Comic Con or this
> dispute. Defendants are to place this
> disclaimer on their websites by **July 20,**
> **2017, at 2:00 p.m.**

*Id*. (emphasis in original).

On July 21, 2017, the District Court issued the formal

"[S]uppression Order" referenced in footnote 1 of its July 18th Order.

Pet. Ex., p. 7. The District Court reaffirmed the restrictions imposed

against Defendants in its prior Order as well as the disclaimer the

Court required Defendants to place on their websites and social media

sites. Pet. Ex., p. 16. The District Court agreed with SDCC that

SDCC's "constitutional right to a fair trial is being threatened by the

comments, posts, and actions of Defendants." Pet. Ex., p. 2. The District Court made the important following findings:

- Based on the number of followers on Brandenburg's Twitter feed and the Salt Lake Comic Con Twitter Feed (more than 5,200 and more than 30,000, respectively, the 200,000-plus media articles written about this case, and the number of attendees at the Salt Lake Comic Convention in 2014, the Court found "it is clear to the Court than any posting, sharing, liking, of dissemination of information by *Defendants* through their range of online networks would reach an extensive amount of people." *Id*. (emphasis added).

- "Defendants, specifically Defendant Brandenburg, use their various websites and social media pages to voice their opinions on the merits of this case." *Id*.

- "[T]he evidence . . . demonstrates that the venire is being influenced through social media dialogue[,]" including the following:

  o Posts Brandenburg made about the claims and defenses at issue in this lawsuit on his personal

Facebook page and the commentary and dialogue they provoked from third parties. Pet. Ex., pp. 14-15.

o      "Defendants' websites and social media applications are packed with comments such as 'Comic Con' is generic' and 'SDCC declared false information to obtain the 'Comic Con' trademark[.]" Pet. Ex., p. 13.

o      "[T]he Salt Lake Comic Con website has an entire section devoted to the instant matter with subheadings titled 'Comic Con is generic.'" *Id*.

The District Court concluded: "In view of the comments, postings, and discussions initiated by Defendants on their various social media platforms, it is plain to the Court that a serious and imminent threat to a fair trial outweighs the First Amendment rights at stake." Pet. Ex., pp. 13-14. The District Court further concluded that although the free speech rights granted the First Amendment are undoubtedly important, "the unique circumstances surrounding this litigation in combination with the multitude of alarming responses

from Facebook users who have viewed Defendant Brandenburg's posts warrants the issuance of a suppression order." Pet. Ex., p. 15 .

### D. Defendants Failed to Comply with the Suppression Order

SDCC closely monitored Defendants' compliance with the Suppression Order and immediately noted a failure to comply in numerous respects. SDCC thereafter undertook sustained efforts to meet and confer with Defendants to procure compliance without District Court intervention, beginning with an email from SDCC's counsel to Defendants' counsel on July 23, 2017. *See* EX, p. 410. SDCC pointed out the following:

- The required disclaimer does not appear prominently on the Salt Lake Comic Con website, and is instead buried at the bottom in fine print.

- The required disclaimer does not appear on Salt Lake Comic Con's Facebook page or Twitter feed at all.

- The required disclaimer does not appear prominently on Brandenburg's Facebook page, but instead as the first "comment" to Brandenburg's various postings of media articles related to the lawsuit.

- Brandenburg's posting of media articles itself

15

violates the Suppression Order.

- The required disclaimer does not appear on Brandenburg's Twitter feed at all.

Following this email, SDCC's counsel initiated four separate telephone conferences with Defendants' counsel regarding Defendants' failure to comply with the Suppression Order. Those telephone conferences occurred on July 24, 2017, July 26, 2017, July 28, 2017, and August 1, 2017. EX, p. 392. SDCC also followed up with email correspondence. *See* EX, pp. 412-421. For the most part, Defendants remained in non-compliance with the District Court's Suppression Order.

### E.  SDCC's Motion for an Order to Show Cause.

On August 8, 2017, SDCC filed an application for an Order to Show Cause Why Sanctions Should Not be Imposed against Defendants Dan Farr Productions, LLC, Daniel Farr and Brandenburg for Failing to Comply with Court Order. EX, p. 360.

SDCC asked the District Court to find Defendants in contempt for failing to comply with the District Court's order, and to impose appropriate sanctions. EX, p. 361.

**F.     The District Court's Supplemental Order.**

After reviewing SDCC's motion for an order to show cause, and after Defendants' filed their opposition on August 23, 2017, the District Court issued a supplemental order on August 24, 2017.  Pet. Ex., p.18.  The District Court reaffirmed in its supplemental order that its prior order requiring a disclaimer applied to all of the Defendants, including Defendant Brandenburg.  Pet. Ex., p.19.  The District Court also found that the disclaimer was not set forth prominently on Salt Lake Comic Con's websites as previously ordered by the District Court.   Pet. Ex., p.19.

**G.     The District Court's Amended Order.**

The District Court heard oral argument on SDCC's motion for an order to show cause.  Thereafter, on September 25, 2017, the District Court issued an "Amended Order" finding that Defendants did violate the District Court's previous orders.  Pet. Ex., p.22.  The District Court imposed sanctions on defendants, but found that Defendants were not in contempt of court at that time.  Pet. Ex., p.22.  The District Court ordered Defendants "to remove <u>all</u> references to the pending litigation, except the disclaimer ordered by the Court, on their websites and social media.  This includes their personal Twitters and

17

Facebooks and similar social media, as well as the Salt Lake Comic Con websites and associated social media platforms." Pet. Ex., p.23. The District Court also noted that "Defendants informed the Court that the portion of the Salt Lake Comic Con website that violated the Court's previous three rulings was taken down on September 21, 2017, at around 5:50 P.M." Pet. Ex., p.23.

## ARGUMENT

## I. BACKGROUND: DEFENDANTS' BURDEN IN SEEKING A WRIT OF MANDAMUS.

The burden is on the petitioner to show that its "right to the writ is clear and indisputable." *Calderon v. Unites States Dist. Court,* 103 F.3d 72, 74 (9th Cir. 1996). Where a decision is within the district court's discretion, "it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'" *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36 (1980).

A petitioner must establish that the district court's order is clearly erroneous. *Islamic Shura Council of Southern Calif. V. Federal Bureau of Investigation,* 635 F. 3d 1160, 1165 (9th Cir. 2001). The absence of clear error by the district court is dispositive – a petition for writ of mandamus must be denied. *Plata v. Brown,* 754 F.

3d 1070, 1076 (9th Cir. 2014). The clear error standard requires that this Court have a "firm conviction' that the district court misinterpreted the law, or committed a clear abuse of discretion." *In re Perez,* 749 F. 3d 849, 855 (9th Cir. 2014). The district court's order must be "clearly erroneous as a matter of law." *Bauman v. United States Dst. Court,* 557 F.2d 650, 654-655 (9th Cir. 1977).

## II. DEFENDANTS HAVE FAILED TO SHOW THAT THE DISTRICT COURT'S ORDERS ARE CLEARLY ERRONEOUS AS A MATTER OF LAW.

### A. Defendants publicly campaigned to taint the outcome of this case by adjudicating the parties' dispute in the media instead of the courtroom.

Since the inception of this dispute, Defendants engaged in a willful, open, and consistent strategy to win this case "in the court of public opinion." *See* EX, p. 203. Through numerous press releases, articles, interviews with various media outlets, and the pervasive use of social media, Defendants (most notably Bryan Brandenburg) posted material and made statements that are designed to tarnish the reputation of SDCC and thereby influence the public (including the jury pool) regarding who should prevail in this litigation. In many

19

instances, these statements were misleading, prejudicial, inflammatory, or false. Indeed, Defendants made their strategy and intention clear from the outset. On August 11, 2014, shortly after the dispute between the parties began, Brandenburg commented extensively in an article in Inside Counsel titled "Salt Lake Comic Con founders fight back" with the subtitle "Use the court of public opinion to combat trademark infringement claims brought by the San Diego Comic-Con." *Id*. The article paints Defendants as "David" to SDCC's "Goliath," and compares SDCC to Superman's nemesis Lex Luthor. Brandenburg is credited in the article with the following statement "[a]fter consulting with their lawyers, the team behind the Salt Lake Comic Con knew they had strong legal ground to stand on, but they didn't want to go to court, ***they wanted to win in the court of public opinion***." *Id.* (emphasis added). Brandenburg is further quoted as saying "[o]ur strategy was, if we are going to spend legal fees vs. legal fees, we wanted to be creative. ***We put it out to the public***, challenging the cease and desist letter publically." EX, p. 204 (emphasis added) (noting "the fans seem to be on the side of Salt Lake's David rather than San Diego's Goliath").

Defendants launched a smear campaign against SDCC, which only increased in intensity as this case approaches trial. For example, on June 27, 2017, Defendants issued an extensive press release that appeared in Business Wire. *See* EX, pp. 206-209. In that press release Defendants repeatedly claim SDCC and individuals associated with SDCC engaged in fraud:

- SDCC's "trademarks in this case were obtained by fraud;"

- "Salt Lake Comic Con has shown in recently filed court documents that San Diego's declaration was false and fraudulent;"

- "San Diego filed a fraudulent response declaration to the Trademark Examiner's rejection, stating that 'Comic-Con' was exclusively used by, and that the mark has become exclusively associated with, San Diego;"

- "The comic con term is generic and the trademarks in this case were obtained by fraud on the Patent and Trademark office;"

- "Salt Lake Comic Con seeks to add a claim to cancel the Comic-Con registration because it was

21

obtained by fraud on the Trademark Office;"

- Quoting Brandenburg as stating "This case is unwarranted and based on fraudulent documents filed with a federal agency."

*See id.*

These types of inflammatory and false statements by Defendants in the media are pervasive. In the Business Wire press release described above, Defendants list specific milestones Salt Lake Comic Con has achieved in connection with this dispute, including having "***secured more than 200,000 media articles reporting on the case***," the majority of which "were overwhelmingly favorable to [Defendants'] case." (emphasis added). EX, p. 208.

Importantly, Defendants' public campaign was not limited to press releases and contact with news media outlets. Bryan Brandenburg waged war against SDCC on social media as well. Brandenburg used his Twitter feed, with more than 5,200 followers, to comment on the dispute and disparage SDCC. *See* EX, pp. 218-219. Similarly, Defendants used the Salt Lake Comic Con Twitter feed, which has more than 30,000 followers to comment on the dispute and accuse SDCC of fraud. *See* EX, p. 221. Brandenburg's Facebook

page was replete with false, disparaging, and/or inflammatory statements about SDCC in an attempt to taint the jury pool in Defendants' favor. Brandenburg's statements had the effect of inciting numerous people to "comment" by posting further inflammatory or false statements about SDCC. For example, on June 26, 2017, Brandenburg posted the comment "Busy week. Truth and Justice FTW" followed by substantial excerpts from Defendants' pleading describing Defendants' allegations of fraud against SDCC. *See* EX, p. 229. This post is followed by a further comment from Brandenburg that states "[t]his is the fraudulent statement they used to obtain their trademarks when they knew there were many comic cons out there." EX, p. 230. Below Brandenburg's comment was a link to the Salt Lake Comic Con website as well as a screen shot from an SDCC filing with the USPTO transposed over an image of a smoking gun. *Id.* Numerous comments then followed from various people.

- Aimee Evans comments "So they lied? [T]hat's ridiculous. So much hard work and money has gone into this. How mean of them . . ."

- Heather Child comments "I love the smoking gun in the background! Truth!"

- Kerry Gisler comments "Their entire lawsuit was predicated on a falsehood. LOL."

EX, pp. 230-231.

Of course, these comments are precisely what Defendants are hoping for and Brandenburg is more than happy to fan the flames. In response to Kerry Gisler's comment above, Brandenburg responded "[w]elcome to America. We have spent almost $1 million defending ourselves against this mess of a lawsuit." EX, p. 231. In a subsequent comment on the same discussion thread, Brandenburg stated "[w]e're excited to have a crystal clear paper trail of false declarations to the trademark office. It's beyond our expectations in already an incredibly strong case for our defense." EX, p. 232. This led an individual named Sarah Hanisko to subsequently comment "Soooooo. They lied? Isn't there like a fine for falsifying stuff?" *Id.* In direct response to that comment, Brandenburg stated: "It's a Felony." *Id.*

Brandenburg did not limit his false and inflammatory comments on Facebook to his personal page. Brandenburg also posted substantial content on a public Facebook page called "Rate that Comic Con," which has more than 4,800 members and is described as "a site to allow you the fans, creators, and vendors to leave a [sic]

24

feedback on a 5 star rating of your personal experience." *See* EX, pp. 241-254. Brandenburg routinely posted comments on the Rate that Comic Con Facebook page declaring that SDCC lies, is corrupt and engages in unethical behavior, and is out to bully and harass the entire comic convention industry. These comments include misleading statements about the frivolous nature of this litigation and call on others in the industry to join Defendants in fighting SDCC. In one instance, Brandenburg posted a link to an article about Robin Donlan, and SDCC board member and Vice-President of events for SDCC. EX, p. 250. The article mentions a civil lawsuit filed by Ms. Donlan's husband's former employer and the Securities and Exchange Commission regarding certain stock options the Donlans had issued and sold. Brandenburg's intention was clear—to attempt to create the illusion of impropriety and corruption by trying to connect the lawsuit against the Donlans with SDCC. At least one person responded to Brandenburg's post by commenting "As to what Bryan posted – someone who was a volunteer at comic-con did something potentially illegal outside of their [SDCC] duties. So what? How does that implicate [SDCC]?" EX, p. 251. Brandenburg responded to this by

commenting "She was and I think still is a Director.  There's more to the story that will come out at trial."  *Id.*

In yet another example, Brandenburg posted the following on the Rate that Comic Con Facebook page: "UPDATE: There is proof in the public record of the Patent and Trademark Office that San Diego Comic-Con International provided FALSE information to secure 1 or more of its 'incontestable' trademarks."  *See* EX, p. 258.

Additionally, on the official website for Salt Lake Comic Con, Defendants devoted an entire web page to the dispute between the parties at http://saltlakecomiccon.com/san-diego-comic-con-intl-v-salt-lake-comic-con/.  *See* EX, p. 263.  Defendants included an immense amount of material on this web page designed to mischaracterize the parties' positions and litigate their case to the public.  In fact, there was so much information about this dispute that Defendants included a 15-part Table of Contents at the beginning of the web page.  EX, pp. 263-264.  The content of this webpage devoted exclusively this lawsuit included irrelevant articles about two members of SDCC board of directors, argued the term "comic con" is generic, provided Defendants' opinions on the merits of this case, and

included links to hundreds of article*s* that comment on this litigation.
*Id.*

### B. Defendants have failed to show that the District Court's Suppression Order is clearly erroneous as a matter of law.

**Defendants' Vagueness Argument.** Defendants' initial argument is that the District Court's July 18 Order "is internally inconsistent, hence unconstitutionally vague." *See* Petition for Writ of Mandamus ("Pet."), p. 19.

In fact, the District Court's July 18 Order (Dkt. 147) clearly prohibits Defendants from making comments on topics relating to four specified statements. Pet. Ex., p. 3. In its formal Suppression Order that followed on July 21 (Dkt. 159), the District Court reiterated that it was granting a suppression order as to the four specified statements. Pet. Ex., pp. 10, 16.

There was no vagueness or ambiguity. Defendants attempt to rely upon an entirely different part of the District Court's July 18 Order that described what must be noted on the Salt Lake Comic Con website in what the District Court characterized as a disclaimer. Pet., p.19; quoting Pet. Ex., p.4. But that statement is intended for readers

of the Salt Lake Comic Con website; it does not alter the clear prohibition directed to Defendants on the four specified statements in the July 18 Order and the subsequent July 21 Suppression Order. There is no "internal inconsistency," as Defendants erroneously assert.

**Defendants' "Narrowly Drawn" Argument**.  Defendants also argue that the "second suppression order" is not "narrowly drawn." Pet., pp. 32-33.  Defendants assert that any order should have only restrained Defendant "Brandenburg (not all petitioners)" from "commenting on fraud (not genericness, descriptiveness, or abandonment) on social media (not in other settings)."  Pet., p. 33.

Defendants' argument ignores the findings made by the District Court in its formal Suppression Order on July 21 (Dkt. 159).  In finding that there is a serious and imminent threat to SDCC's right to a fair trial, the District Court pointed to comments on all of "Defendants' websites and social media applications."  Pet. Ex., p. 13. That finding was well-supported by the record and was not limited to comments by Defendant Brandenburg on fraud.  Pet. Ex., p. 13; citing EX, pp. 228-233, 265.

Thus, the Suppression Order was narrowly and appropriately drawn.

**Defendants' "Serious and Eminent Threat" Argument**.

Defendants' main argument is that "[n]o serious and imminent threat justified the second suppression order."  Pet., p. 20.

Before a trial court can limit parties' and their attorneys' right to freedom of speech, the court must make sufficient specific findings establishing that the party's conduct presents a "serious and imminent threat to the administration of justice."  *Levine v. United States Dist. Court for Cent. Dist.*, 764 F.2d 590, 595 (9th Cir. 1985).  It is appropriate, however, to impose greater restrictions on the free speech rights of trial participants (such as parties and their attorneys) than on the rights of nonparticipants.  *Levine*, 764 F.2d at 595.  As this Court noted when considering a district court's order restricting statements of trial participants, "several other courts have considered similar restraining orders.  The overwhelming majority of those courts have upheld the restraining orders."  *Id*. at 596 (citing numerous cases in which restraining order on trial participants were upheld).

The potential for injury to the integrity of the judicial process is significant in cases involving trial publicity.  *Id*. at 597.  As the Supreme Court has noted, "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence

29

and argument in open court, and not by any outside influence, whether of private talk or public print." *Id*. (citing *Patterson v. Colorado*, 205 U.S. 454, 462 (1907)). "This objective can be obtained only if publicity created by private litigants is subject to reasonable restrictions." *Id*.

Here, the District Court found that there is "a serious and imminent threat" to SDCC's right to a fair trial. Pet., p. 14. The District Court stated that "it is clear to the Court that any posting, sharing, liking, or dissemination of information by Defendants through their range of online networks would reach an extensive amount of people." Pet. Ex., p. 12.

Defendants point to "San Diego's populous and metropolitan character' (Pet., p. 23) and argue that "[g]iven the large, diverse pool of residents eligible for jury duty, any suggestion that 12 impartial individuals could not be empaneled… is hard to sustain." (Pet., p. 29). Defendants further argue that the evidence "does not show that the venire is being influenced." Pet., p.29. Both of these arguments miss the point. This court has rejected the notion that a suppression order can be upheld only if there is a showing that an impartial jury cannot be selected. *Levine*, 764 F.2d at 598.

30

At the hearing prior to the issuance of the Suppression Order, the District Court specifically noted that it was concerned with both: (1) the threat to selection of an impartial jury, and (2) the risk that jurors would find improper material online. The District Court stated:

- "[I]t's no small stretch of the imagination that if I go google Comic Con I am going to get links, probably to sites to both conventions. And it wouldn't take long for anyone in the world to come across this information, much of which will be part of the potential jury pool." EX, p. 323. "[W]ith the utility and ease of communicating devices now and the way search engines work, it's a small step before San Diegans become potentially compromised." EX, pp. 324. "[T]he nature of the type of communications that are focused on here for relief have an impact on the public, which is easily going to contaminate or is strongly likely to contaminate -- the venire." *Id*.

- "And during the trial, while we admonish juries not to go to the public media, not to look at the news, there is enough cases on the books to show that people do. And if someone does, I wouldn't want them to find any of this stuff." EX, p. 315.

■ "I see a contamination of individuals in the jury that have been won over, and I don't think it's a far cry to suggest that there is an immediate danger - - clear and present danger - - that as the media continues to report the advancing trial, people go online and want to find out, and therein lies the danger." EX, p. 332.

Thus, regardless of San Diego's "metropolitan character" and regardless of whether the venire is currently being influenced, the District Court properly found a serious imminent threat to the administration of justice. "Even if an impartial jury could be selected, intense prejudicial publicity during and immediately before trial could allow the jury to be swayed by extrajudicial influences." *Levine*, 764 F. 2d at 598.

### C. Defendants failed to comply with the Suppression Order.

### 1. Defendants failed to prominently place the disclaimer on the home page of the Salt Lake Comic Con website.

The District Court ordered Defendants "to note on the Salt Lake Comic Con website that the Court has ordered that no editorial comments, opinions, or conclusions about the litigation may be made on social media and that no highlights or summaries of the status of the proceedings or the evidence presented will be made on social

media." Pet. Ex., p. 4. The District Court further directed Defendants to place the disclaimer "prominently" on the home page of the Salt Lake Comic Con website[.]" *Id*.

Defendants failed to comply with the District Court's directive. Placing the disclaimer in small print at the bottom of the website home page does not constitute prominent placement. Likewise, including a button entitled "SDCC vs SLCC" toward the top of the home page does not constitute prominent placement, because the viewer is required to undertake additional steps to reach the disclaimer (if he or she even expends the effort to do so). Defendants were not unable to comply with the Suppression Order in this respect, as evidenced by the fact that the disclaimer does appear at the top of the section of the website that is devoted to this lawsuit.

**2. Defendants failed to prominently place the disclaimer on the Salt Lake Comic Con Facebook page.**

In addition to ordering Defendants to place the disclaimer prominently on the Salt Lake Comic Con Facebook page, the District Court ordered Defendants to place the disclaimer prominently on their social media sites. *Id*. Defendants did not do so. Instead, on the Salt Lake Comic Con Facebook page, Defendants posted a "note" with

33

just one incomplete sentence of the disclaimer. The viewer must click through further on the note in order to see the full disclaimer, at which point he or she is invited to comment on the same.

Defendants are fully able to post the complete disclaimer on the Salt Lake Comic Con Facebook page. Moreover, it is inappropriate for Defendants to allow viewers to comment on their disclaimer, as this prompts the very type of social media dialogue that caused the Court great concern about protecting the integrity of the judicial process. Defendants have admitted that they can hide the comments so they cannot be seen, yet refuse to do so.

3. **Defendant Brandenburg failed to place any disclaimer whatsoever on his Facebook page.**

With respect to Defendant Brandenburg, the Court specifically called out statements and comments he made on his personal Facebook page as grounds for issuing the Suppression Order. Brandenburg voluntarily and wholeheartedly used his personal Facebook page to comment extensively on this case in general, on the validity of Defendants' asserted defenses, on legal issues that are within the province of the jury, and to accuse SDCC of various bad acts and committing a "felony."

SDCC's motion for protective order was directed toward all three Defendants. The Suppression Order likewise requires compliance by all three Defendants. *See* Pet. Ex., pp. 3-4.

**4.    The section of the Salt Lake Comic Con website devoted to this lawsuit violated the Suppression Order.**

Defendants' refusal to delete or, at a minimum, modify the content appearing in the section of the Salt Lake Comic Con website devoted to this lawsuit also violated the District Court's Order.

- The Suppression Order prohibits Defendants from enhancing their publication of public documents that relate to this case with comments, opinions, editorials or conclusions that relate to topics three through six enumerated elsewhere in the Order; and

- The Suppression Order requires Defendants to place a disclaimer on their websites and social media sites that the Court has ordered that no editorial comments, opinions or conclusions about the litigation may be made on social media, and that no highlights or summaries of the status of the proceedings or the evidence presented shall be made on social media.

Pet. Ex., p. 4.

The content of the section of the Salt Lake Comic Con website devoted to this lawsuit is precisely what the Suppression Order addresses.  Defendants' maintenance of this section of the website is antithetical to the intent and purpose of the Suppression Order.  There is no difference between publishing new content that violates the Suppression Order and maintaining existing content that does the same.  For example, a Google search for "sdcc vs slcc" brings up this section of the Salt Lake Comic Con website as the first hit.  In this instance, the harm to SDCC and a fair trial is inescapable.

> **D.**    **Defendants have failed to show that the District Court's Amended Order is clearly erroneous as a matter of law.**

**Defendants' "No Violation" Argument.**  In its Amended Order issued on September 25 (Dkt. 264), the District Court found that Defendants violated its previous orders.  Defendants argue that they did not violate the prior orders:  According to Defendants, the prior orders did not require them to take down from the Salt Lake Comic Con website any content that was already there prior to the

Suppression Order. Pet., pp. 33-35. Defendants' argument is flawed in several respects.

First, Defendants ignore the fact that they violated the Suppression Order in several ways—not just by failing to take down the section of the Salt Lake Comic Con website devoted to this lawsuit. *Supra*, pp. 32-36.

Second, Defendants' failure to take down the offending section of the Comic Con website does indeed violate the Suppression Order. The District Court's prior orders proscribed Defendants from "making" specified statements. Pet. Ex., p. 3. By continuing to maintain the section of the Salt Lake Comic Con website containing statements that violated the Suppression Order, Defendants were "making" those statements by any reasonable definition. Thus, Defendants violated the District Court's previous orders.

**Defendants' "Criminal Contempt" Argument.** Defendants also argue that the Amended Order issued by the District Court on September 25 (Dkt. 264) constitutes "a criminal contempt sanction imposed without due process." Pet., p. 35. Petitioners cannot point to any case holding that an amendment to a suppression order constitutes "a criminal contempt sanction." Indeed, one of the cases cited by

37

Defendants recognizes that "civil sanctions are wholly remedial."

*Whittaker v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). Here,

the District Court's "sanction" was remedial, directed at safeguarding

SDCC's right to a fair trial: "The Comic Con page for Salt Lake

ought to be just about that: their events, their products, their dealings.

But the lawsuit needs to be litigated in court and spoken about

thusly." EX, p. 1731. The District Court added: "I don't find there is

any other way to more narrowly draw the restrictions." *Id.*

Thus, the Amended Order was "[u]nlike the punitive nature of

criminal sanctions." *Whittaker*, 953 F.2d at 517.

**Defendants' Argument on "Republication."** Defendants

argue, as to both the Suppression Order and the Amended Order, that

they should be allowed to republish already public documents. Pet.,

pp. 38-40. Defendants fail to mention that the order issued by the

District Court on July 18 (Dkt. 147) already allows precisely that,

subject to the condition that Defendants are "not to enhance the post

with any comments, opinions the post with any comments, opinions or

conclusions." Pet. Ex., p. 4.

**Defendants' "Disclaimer" Argument.** Finally, Defendants

argue that the "mandatory disclaimer requirement should be undone."

Pet., p. 40.  Defendants assert, without basis, that "[t]he only apparent purpose served by *requiring* petitioners to 'prominently' display a disclaimer . . . is to shame them."  Pet., p. 42.  That is nonsense in light of the District Court's careful explanation of the serious and imminent threat to the administration of justice.

## **CONCLUSION**

For the foregoing reasons, real party in interest San Diego Comic Convention respectfully submits that the petition for writ of mandamus should be denied.

Date: October 6, 2017.

PILLSBURY WINTHROP
  SHAW PITTMAN LLP
KEVIN M. KONG
CALLIE A. BJURSTROM
PETER K. HAHN
MICHELLE A. HERRERA

By: s/ Kevin M. Fong

Attorneys for Real Party in
Interest, San Diego Comic
Convention

## **STATEMENT OF RELATED CASES**

Real party in interest is not aware of any cases pending in this court, pursuant to Ninth Circuit Rule 28-2.6.

## **CERTIFICATION OF COMPLIANCE**

## **PURSUANT TO FED. R. APP. P. 21(d)(1)**

I certify that, pursuant to Fed. 12. App. P. 21(d)(1), the attached

brief is proportionately spaced, has a typeface of 14 points and

contains 7,171 words.

Date: October 6, 2017

s/ Kevin M. Fong
Kevin M. Fong