FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 26 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: DAN FARR PRODUCTIONS; BRYAN BRANDENBURG; DANIEL FARR. _____ DAN FARR PRODUCTIONS; DANIEL FARR; BRYAN BRANDENBURG, Petitioners, v. UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO, Respondent, SAN DIEGO COMIC CONVENTION, Real Party in Interest. | No. 17-72682 D.C. No. 3:14-cv-01865-AJB-JMA OPINION |

Petition For Writ Of Mandamus

Submitted October 10, 2017[*]
San Francisco, California

Before: WARDLAW, GOULD, and WATFORD, Circuit Judges.
PER CURIAM:

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

This petition for a writ of mandamus arises in the context of a hotly contested trademark action initiated by San Diego Comic Convention ("SDCC") against the producers of the Salt Lake Comic Con—Dan Farr Productions, Daniel Farr, and Bryan Brandenburg ("Petitioners")—over the use of the mark "comic-con" or "comic con." The case has drawn nationwide attention and discussion on traditional and social media alike, in part because "comic cons" have been held in hundreds of venues across the United States. Because defendants actively participated in the public discussions over the internet, on various websites and through social media platforms, including Twitter feeds and Facebook postings, SDCC successfully moved for a sweeping set of "suppression orders" prohibiting Petitioners from expressing their views on the pending litigation and from republishing public documents over social media platforms. Instead, the court ordered Petitioners to prominently post on their social media outlets its order prohibiting comments about the litigation on social media, dubbing this posting a "disclaimer." Petitioners assert that the court-ordered prior restraints on their speech violate the First Amendment. We agree, and order that the district court vacate the "suppression" and "disclaimer" orders.

I

## BACKGROUND

SDCC is a non-profit corporation dedicated to the appreciation of comics and other popular arts through events, including its "Comic-Con convention" in San Diego, California. Petitioners produce Salt Lake Comic Con, which is a comic and popular arts convention in Salt Lake City, Utah. In 2014, SDCC filed this federal trademark action against Petitioners, alleging that their use of the term "Comic Con" infringes on SDCC's "COMIC-CON" family of service marks and constitutes false designation of origin under the Lanham Act. Petitioners filed an answer and counterclaims against SDCC, in which they allege that SDCC has abandoned the trademarks asserted against them and that the trademarks are generic and descriptive. The district court denied Petitioners' subsequent motion to amend their defenses and counterclaims to allege that SDCC procured its trademark registrations by fraud. Trial is scheduled to begin on November 28, 2017.

Throughout the litigation, Petitioners have posted on their websites and social media platforms various news articles on the case, documents that are publicly available on the district court docket, and their own opinions on the merits of the case and SDCC's conduct. Petitioners assert that they are seeking moral and material support from comic fans everywhere who also use the term "comic con,"

and that the target audience of their speech is "people *outside* the venue, where the litigation's effects will be most felt."[1]

On July 6, 2017, SDCC moved the district court for a "protective order" to prohibit Petitioners from making public statements prior to and during trial on certain topics relevant to the merits of the case. SDCC argued that Petitioners' objective is to "taint[] the jury pool" and "win this case in the court of public opinion." In support of its motion, SDCC submitted evidence of Petitioners' numerous social media posts that express their opinions on the merits of the case and user responses thereto; two of Petitioners' press releases, one of which "boast[s] they have secured more than 200,000 media articles reporting on the case" and "claim[s] the majority are overwhelmingly favorable to [Petitioners'] case"; pages from Petitioners' website with links to news articles on the case and documents filed in the district court; and one 2014 online magazine article that quoted Petitioner Brandenburg.

The district court granted the motion in part, concluding that Petitioners' comments, posts, and actions were threatening SDCC's constitutional right to a fair trial. The order prohibits Petitioners from commenting on "topics that relate to":

---

[1] As the district court noted, "comic cons are held in nearly every state of the United States" and "over 100 competitors us[e] the unhyphenated form of Plaintiff's trademark."

(3)  Any statement that accuses, suggests, implies, or states that SDCC lied and/or committed fraud (other than in documents to be filed with the Court);

(4) Any statement about the genericness of the term comic con (other than in documents to be filed with the Court);

(5) Any statement about whether the term comic con is descriptive (other than in documents to be filed with the Court);

(6) Any statement about whether SDCC abandoned any trademark rights (other than in documents to be filed with the Court).

The order also states that if Petitioners "post, share, publish, or link public documents that relate to this case . . . they are ORDERED to publicize the documents in full or share a link to the full document," and may not enhance postings with "any comments, opinions, editorials or conclusions that relate to the foregoing statements that have been deemed suppressed."  Finally, the order requires Petitioners to prominently post a disclaimer describing its requirements on their "website, social media site, and any print or broadcast advertisement or press release that makes reference to San Diego Comic Con or this dispute."  The mandated disclaimer is to state that the district court "has ordered that no editorial comments, opinions, or conclusions about the litigation may be made on social media and that no highlights or summaries of the status of the proceedings or the evidence presented will be made on social media."

SDCC then requested contempt sanctions for Petitioners' alleged violation of the order.  The district court found Petitioners were not in contempt of court, but

5

nevertheless entered a sanctions order that further restricted Petitioners' speech by prohibiting "all references to the pending litigation, except the disclaimer ordered by the Court, on [Petitioners'] websites and social media." Further, the district court prohibited Petitioners from re-publishing any publicly available documents about the case, including documents publicly filed in the district court. *See* September 21, 2017 Hearing Transcript at 108:19–21 ("[N]ow I'm basically saying you post no documents about the issues in the case—no comment, no postings."). The district court also ordered Petitioners to pay all costs and fees associated with the contempt motion.

## II

The orders at issue are unconstitutional prior restraints on speech.[2] They prohibit speech that poses neither a clear and present danger nor a serious and imminent threat to SDCC's interest in a fair trial. The well-established doctrines on jury selection and the court's inherent management powers provide an alternative, less restrictive, means of ensuring a fair trial.[3] *Levine v. U.S. Dist.*

---

[2] There is no dispute that the district court's orders are prior restraints on speech, as the district court itself acknowledges. There is a heavy presumption against prior restraints on speech, and they are subject to the strict scrutiny standard of review.
[3] Contrary to SDCC's argument, *Levine*'s recognition that a lower standard applies to prior restraints of *attorneys* participating in a case, who are officers of the court subject to fiduciary and ethical obligations, does not apply to non-attorney participants.

*Court*, 764 F.2d 590, 595 (9th Cir. 1985); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

## A

Petitioners' speech does not constitute a serious and imminent threat to SDCC's right to a fair trial. A prior restraint to ensure a fair trial is permissible "only if its absence would prevent securing twelve jurors who could, with proper judicial protection, render a verdict based only on the evidence admitted during trial." *Hunt v. Nat'l Broad. Co.*, 872 F.2d 289, 295 (9th Cir. 1989) (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 569 (1976)).

The district court found that standard was met because of the reach of the internet. It found that Petitioners through their "range of online networks would reach an extensive amount of people" because "Brandenburg's Twitter feed has more than 5,200 followers, the Salt Lake Comic Con Twitter feed has more than 30,000 followers, there have been more than 200,000 media articles reporting on the instant case, and in 2014 Salt Lake Comic Con had more than 120,000 attendees." It concluded that the jury "venire is being influenced through social media dialogue" in which Petitioners express "their opinions on the merits of this case," giving nine examples of Facebook comments responding to Brandenburg's posts that expressed support for Petitioners' litigation position.

7

However, there is no causal link between the numbers of social media participants and the district court's conclusion that Petitioners' speech will preclude the seating of an impartial jury. The district court draws prospective jurors from a list of approximately 1.75 million registered voters in San Diego and Imperial Counties.[4] Simply stated, there is no evidence connecting the scope of Petitioners' speech with the relevant jury pool. SDCC has presented no evidence as to how many, if any, of the approximately 35,200 Twitter followers are registered voters in San Diego and Imperial Counties and how many, if any, of the 120,000 attendees of the 2014 Salt Lake Comic Con in Utah are even possibly members of the current San Diego-area jury pool. Even were we to hypothetically and implausibly assume that each Twitter follower and 2014 Salt Lake Comic Con attendee is a registered voter in San Diego and Imperial Counties (and that there is no overlap), that group would constitute only approximately 8.9 percent of the relevant jury pool, which is insufficient to demonstrate that twelve unbiased jurors could not be found absent the restraining orders. *See Hunt*, 872 F.2d at 295 (where pre-trial broadcast would likely reach slightly more than 20 percent of all adults in

---

[4] *See* UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA, https://www.casd.uscourts.gov/Jurors/SitePages/Home.aspx (last visited Oct. 19, 2017); CALIFORNIA SECRETARY OF STATE, REPORT OF REGISTRATION AS OF FEBRUARY 10, 2017, REGISTRATION BY COUNTY, http://elections.cdn.sos.ca.gov/ror/ror-pages/ror-odd-year-2017/county.pdf (last visited Oct. 19, 2017).

the relevant area, "there remain[ed] an extremely large pool of untainted potential jurors from which to draw twelve"); *Columbia Broad. Sys. v. U.S. Dist. Court*, 729 F.2d 1174, 1182 (9th Cir. 1984) ("*CBS*") (pretrial broadcast of government surveillance tapes "extremely unlikely" to produce "community-wide prejudice" in a venue of twelve million people). As for the "200,000 media articles" highlighted by the district court, they were predominantly a *single* article written *in 2014* by the Associated Press and printed in approximately 160,000 papers *world-wide*. There is no evidence of the extent to which the jury pool was exposed to such coverage, which apparently did not even reach the district court judge.[5] There is also no evidence that any of the Facebook users who expressed support for Petitioners in response to Brandenburg's postings about this case are part of the jury pool, and in any event the record reflects that the total number of such users is insignificant.

The district court's analysis also disregarded two critical factors for evaluating the likely effect of pretrial publicity on the jury pool: whether the subject matter of the case is lurid or highly inflammatory, and whether the community from which the jury will be drawn is small and rural, or large, populous, metropolitan, and heterogeneous. *See Hunt*, 872 F.2d at 294–95 (citing

---

[5] The district court noted at one hearing about the extensive nature of the postings, "Because for some reason, I must live under a rock. I didn't see any [of] this stuff."

9

*CBS*, 729 F.2d at 1180) (the court must examine the capacity of pretrial publicity "to inflame and prejudice the entire community"). Both demonstrate that this case is simply not one of the rare instances in which pretrial publicity mandates prior restraints.

This civil trademark infringement action involves issues that are far more banal than the subject matters of the criminal trials in which pretrial publicity has presented serious constitutional problems. *See, e.g.*, *CBS*, 729 F.2d at 1181 (collecting cases that involved armed robbery, kidnapping, bludgeoning, and murder, and concluding prosecution of prominent defendant for conspiracy to import cocaine was not lurid or highly inflammatory); *Sheppard v. Maxwell*, 384 U.S. 333, 356, 363 (1966) (holding that media coverage contributed to due process violation in murder trial that "intrigue[d] and captivate[d] the public fancy to a degree perhaps unparalleled in recent annals"). And, as we have long held, pretrial publicity is less likely to threaten the fairness of trial in a large metropolitan area. *See Hunt*, 872 F.2d at 295 (concluding that although double murder trial "may involve lurid or inflammatory subject matter, San Mateo County is the type of populous, heterogeneous metropolitan area where prejudicial publicity is less likely to endanger the defendant's right to a fair trial"); *CBS*, 729 F.2d at 1181–82; *Associated Press v. U.S. Dist. Court*, 705 F.2d 1143, 1146 (9th Cir. 1983); *see also Skilling v. United States*, 561 U.S. 358, 382 (2010) ("Given this large, diverse pool

10

of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain.").

The district court also erroneously focused on Petitioners' effective use of their First Amendment rights to mobilize sentiment within the community of "Comic Fandom" worldwide. That a handful of passionate supporters engaged with Brandenburg on his Facebook page and the indisputable fact that "the 'Comic Fandom' community is logically inclusive of San Diego comic fans" does not prove that the jury pool—all adult, registered voters in the San Diego and Imperial Counties—was reached, let alone irreparably tainted. Without such an evidentiary demonstration, the prior restraint orders cannot stand.

**B**

A prior restraint is not the least restrictive means of ensuring a fair trial here. *See Levine*, 764 F.2d at 595. We have previously approved "voir dire, jury instructions, delay, change of venue or jury sequestration" as appropriate alternatives preferable to censorship. *Hunt*, 872 F.2d at 295–96; *see also Nebraska Press*, 427 U.S. at 564.

The district court considered and rejected voir dire, jury instructions, and sequestration. The court found voir dire insufficient because it would entail excluding from the jury all citizens who have read or heard about the case and who

11

keep abreast of current events.⁶ But voir dire means nothing of the sort—rather, it screens out "those with *fixed opinions* as to guilt or innocence." *Nebraska Press*, 427 U.S. at 564 (emphasis added). Similarly, the district court found jury instructions "inadequate" because "the Court cannot run the risk of thinking the jury will do as the Court says." But we and the Supreme Court have repeatedly recognized a rebuttable presumption that juries follow jury instructions. *See, e.g.*, *Harris v. Rivera*, 454 U.S. 339, 346 (1981) (per curiam); *Trillo v. Biter*, 769 F.3d 995, 1000 (9th Cir. 2014). The district court failed to identify any reason why that presumption is inappropriate in this case.⁷ And the court found sequestration "would not be appropriate as jurors should not have to endure the burden of [Petitioners'] transgressions." But juror inconvenience alone cannot outweigh Petitioners' exercise of fundamental First Amendment rights.⁸

---

⁶ We note that the district court purported to rely on our analysis of voir dire in *Levine* but actually cited a quote from the district court's opinion. Our opinion clearly recognized that "searching voir dire" could eliminate bias caused by pre-trial publicity. *Levine*, 764 F.2d at 600.

⁷ For the same reason, SDCC's argument that, regardless of whether an impartial jury could be selected, the restraining orders are necessary based on "the risk jurors would find improper material online" during trial is unavailing. Our recognition in *Levine* that "[e]ven if an impartial jury could be selected, intense prejudicial publicity during and immediately before trial could allow the jury to be swayed by extrajudicial influences," was in the context of a "circus-like environment that surrounds highly publicized trials," a context far removed from the situation here. 764 F.2d at 598 (citing *Sheppard*, 384 U.S. at 342–49 (describing circus-like environment surrounding sensational murder trial)).

⁸ To the extent the district court or SDCC believes Petitioners' speech was *transgressive* rather than just effective, persuasive, or opinionated—and there is no

In addition to improperly analyzing each alternative, we note that the district court's logic disqualified alternatives categorically and would justify imposition of prior restraints in almost any situation where an article is written or a statement is made in a public forum. *Cf. Nebraska Press*, 427 U.S. at 554 ("[E]ven pervasive, adverse publicity does not inevitably lead to an unfair trial."). In doing so, the district court rejected binding precedent that voir dire, sequestration, and jury instructions *can* be alternatives to prior restraints. *See CBS*, 729 F.2d at 1182–83. This record does not demonstrate that those alternatives are unavailable or inappropriate, and any imposition of a prior restraint must be based on *case-specific justifications* for why less extreme measures are not viable alternatives.

## III

Unlike other cases involving attorneys or the press, grisly crimes or national security, the district court's orders silence one side of a vigorously litigated, run-of-the-mill civil trademark proceeding. The orders ban Petitioners from electronically posting, transmitting, or referencing publicly available documents, in their entirety, even if posted without commentary. And the district court went

---

evidence in the record before us supporting such a finding—the proper remedy is almost certainly retrospective damages, not a *broader* prior restraint. *CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) ("Subsequent civil or criminal proceedings, rather than prior restraints, ordinarily are the appropriate sanction for calculated defamation or other misdeeds in the First Amendment context."). Similarly, to the extent Petitioners posted materials subject to a court order sealing them, judicial sanctions might be warranted.

beyond silencing Petitioners: it mandated that they prominently and ubiquitously articulate a "disclaimer" that, at the very least, incriminates and disparages their previously expressed opinions.

The orders are simultaneously unmoored from the interest they purport to protect—the integrity of the San Diego-area jury pool. For example, nothing prohibits Petitioners from contacting and collaborating with San Diego-area media to create newspaper articles, magazine features, or television coverage of the case, and Petitioners would not even have to include the "disclaimer," which is explicitly limited to Petitioners' online activities. Nothing prevents Petitioners from mailing all San Diego-area residents annotated copies of the publicly available filings. And nothing prevents Petitioners from holding press conferences in San Diego at which they discuss the case (while avoiding the specific prohibitions in the first protective order).

Prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press*, 427 U.S. at 559. The district court clearly erred in determining that Petitioners' speech presents a serious and imminent threat to a fair trial and that less restrictive alternatives to a prior restraint on speech were unavailable. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Accordingly, we grant the petition for a writ

of mandamus.[9] The district court is directed to vacate its order of July 18, 2017, as modified on July 21, 2017 and August 24, 2017; and its order of September 25, 2017.

**PETITION GRANTED.**

---

[9] Mandamus jurisdiction is proper under the All Writs Act, 28 U.S.C. § 1651(a), in instances where district courts clearly err in imposing prior restraints. *CBS*, 729 F.2d at 1177–78. The first three factors articulated in *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977), weigh in favor of granting the writ (as we did in *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010), we assume without deciding that pre-trial restraining orders on speech are not reviewable under the collateral order doctrine); the second two factors are inapplicable.

## COUNSEL

Michael I. Katz and L. Rex Sears, Maschoff Brennan PLLC, Irvine, California, for Petitioners.

Callie R. Bjurstrom, Peter K. Hahn, and Michelle A. Herrera, Pillsbury Winthrop Shaw Pittman LLP, San Diego, California; Kevin M. Fong, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California, for Real Party in Interest.